## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CRYSTAL B. NWANERI,

*Plaintiff,*

v.

QUINN EMANUEL URQUHART & SULLIVAN LLP,
WILLIAM BURCK,
DEREK SHAFFER, and
JON COREY,

*Defendants.*

US DISTRICT & BANKRUPTCY
COURTS FOR DC

2020 SEP 17 P 3: 58

RECEIVED

Civ. No. 1:19-cv-01540 (DDC)
**Demand for Jury Trial**

### FIRST AMENDED COMPLAINT

Upon her own knowledge and otherwise upon information and belief, Plaintiff Crystal B. Nwaneri, alleges employment discrimination (based on race, gender, and familial status), ongoing harassment and retaliation by Defendants, in violation of federal and state anti-discrimination statutes and tort law, as follows:

## I.   INTRODUCTION

1.      Plaintiff, an African-American woman, was employed from 2012 until 2016 as an associate in the Washington, D.C. office of Defendant Quinn, Emanuel, Urquhart, and Sullivan, LLP ("Quinn Emanuel"). During that time, Quinn Emanuel's male leadership created and facilitated an inequitable "boys' club", comprised almost exclusively of white men, in which minorities (particularly African-Americans) and women (particularly those have taken statutorily protected maternity leave) have been subjected to a deeply ingrained double standard that results in them being disproportionately paid less, promoted less often, and provided with substantially fewer development opportunities than similarly-situated white and male attorneys.



2.       The D.C. office's boys' club, led by the office's managing partners, created a frat-house atmosphere that not only tolerated, but welcomed, its members' antics—behavior that was not only childish but also racially offensive, sexist, and homophobic.  For example, male attorneys would often enter the offices of unwitting attorneys to send embarrassing and infantile emails from other attorneys' computers, such as one message claiming to be an emergency request for Pepto Bismol because the purported sender had diarrhea and was expecting a client momentarily.  On another occasion, an associate sent a mass email suggesting Latinos were drug-dealing and machine-gun wielding criminals, as he "joked" that a necktie depicting cocaine and AK-47's was befitting of a Colombian attorney.

3.       Rather than reprimand these attorneys—both of whom were white male associates at the time—the office's boys' club rewarded them with partnership.  Likewise, the fraternity's senior partners also brazenly engaged in racially offensive and sexually explicit discussions generally and about other attorneys with whom they worked.

4.       In one exchange, Defendant William Burck (the co-managing partner of the D.C. office) and another senior partner in the D.C. office (Mike Lyle, who has since been elevated to co-managing partner of the D.C. office alongside Burck) vulgarly discussed the female anatomy generally and of a female associate working on a matter for the two men at the time.  Burck commented that he "saw an ass on a girl in Geneva today that I would kiss.  I don't mean even just on the cheeks. Right on the sphincter.  Yes, it was that good." Lyle responded: "Your day sounds way better than mine.  The only female ass I have seen all day is [female D.C. associate who was then working for both men]'s.  Fuck, I shouldn't have said that because now my dick hurts."  Burck replied: "Your dick hurts because you got a stiffie thinking about [female associate]'s ass??? Jesus H. Christ.  You are one sick fucking puppy, you stupid gimp fuckhead."

5.      After Plaintiff, an African-American woman, complained to Burck and others in firm management about the disparate treatment and harassment she experienced from a junior partner Burck frequently worked with (Derek Shaffer, who is also white), Burck began repeatedly disparaging Plaintiff as "fucking stupid" and "an idiot", notwithstanding that Plaintiff is a well-educated graduate of Georgetown University Law Center, had completed two federal clerkships before joining Quinn Emanuel, and that Burck had limited to no knowledge of Plaintiff's work at the time he made these disparaging comments. Consistent with his low opinion of Black people, Burck has also described the predominately African-American survivors of Hurricane Katrina as "animals", as he did while addressing the court during a 2016 hearing.

6.      This is the atmosphere that Defendants and Plaintiff experienced upon her return from maternity-leave in early 2015. And she ran afoul of the boys' club by complaining about the disparate treatment and hostile environment she was subjected to by some of the office fraternity's most senior members, Defendants Burck and Shaffer, on her first assignment after returning from maternity leave (and her first time working with Burck or Shaffer). As explained below, during the four months she was involved in this case, Defendants treated her substantially different than her white and male colleagues, including by assigning her less favorable and substantive work than similarly situated white males on the case team, subjecting her work to more scrutiny and unwarranted criticism, and frequently engaging in verbal abuse and other confrontational and degrading behavior with Plaintiff, while coddling the white and male associates on the case team.

7.      In response to Plaintiff's complaints about Shaffer, Defendants began a ruthless campaign of retaliation against Plaintiff and her close family members that is ongoing. Beyond Burck's pervasive and disparaging insults about Plaintiff and other retaliatory conduct from Defendants, Defendants retaliated against Plaintiff by deciding in July and August 2015—less than

3

4 months after she returned from maternity leave and began work on her first D.C.-based case: (1) to deny Plaintiff any consideration for promotion to partner or of counsel (even though Plaintiff had already deferred partnership consideration until the next year, as allowed by the firm's policy and agreed to by her partner mentor), and (2) to wrongfully terminate Plaintiff's employment (even though the firm's April 2015 performance review for Plaintiff was entirely positive and that she was "on track").

8.     Even though Defendants had no justification for their decision to deny promotion and terminate Plaintiff's employment, they nonetheless marched forward with their plan and informed the founding partner, John Quinn, in or around August 2015 of their plan to terminate Plaintiff's employment.  But they kept Plaintiff in the dark about these decisions until May 2016, nearly a year later.  In the interim, Defendants scrambled to concoct a post hoc reason for their adverse employment decisions by, among other things, subjecting Plaintiff to an unprecedented level of scrutiny, interfering with her existing and prospective billable work, spreading false and misleading information about Plaintiff throughout the firm to dissuade other partners from working with her, and subjecting Plaintiff to other affirmative efforts to suppress her billable hours.

9.     As Defendants attempted to retroactively justify their July and August 2015 decisions to terminate Plaintiff's employment without considering her for promotion, Defendants—particularly Burck and Corey—actively misled Plaintiff about her status at the law firm, claiming that no partnership decisions had been made, that they were satisfied with her work product, Shaffer's feedback about the 4 months they worked together on the previous case would not be included in her annual review for that year, and that Burck was assigning her to two smaller matters in August 2015.

10.     But, as Plaintiff later learned, the two August 2015 matters were set-ups for failure. Both case teams were small—i.e., 2-3 people—and already staffed with attorneys at Plaintiff's level, so there was no role for Plaintiff. Moreover, Burck took various steps to undermine and demean Plaintiff to the other associates on the matter, including Ben O'Neil, a white male associate who often worked with Burck and was up for partnership that year. Just a week after staffing Plaintiff on the new matter with O'Neil (and before Plaintiff had done any work on the matter), Burck disparaged Plaintiff as an "idiot" to O'Neil and shortly thereafter directed O'Neil to "fight" and to "be a man" with Plaintiff, causing O'Neil to be extraordinarily aggressive with Plaintiff, much like the ongoing harassment she experienced with Shaffer.

11.     Plaintiff complained about O'Neil's conduct to Burck in October 2015, unaware of Burck's degrading comments about Plaintiff and his efforts to encourage O'Neil's hostility toward Plaintiff. Burck continued to mislead Plaintiff about her status on the case and at the law firm, telling her that her work was "good" giving her additional work on the matter, which she reverted the next day. While Defendants' mixed messages regarding Plaintiff's future at the firm were confusing, what became apparent was Quinn Emanuel's continuing—and escalating—pattern of retaliation against Plaintiff each time she opposed Defendants' discriminatory and unlawful conduct. Shortly after her October 2015 complaints about O'Neil, Burck phased Plaintiff off the August 2015 cases with no explanation and made no efforts to assist her in finding additional billable work.

12.     Even more, as Burck's role in Plaintiff's difficulty in securing billable work became more apparent, Plaintiff approached Corey with her concerns several times, including in-person meetings in early 2016 and emails in March and April 2016. Quinn Emanuel responded the same way each time: denial of any underlying problem, claiming there was no billable work, and

refusing to investigate Plaintiff's concerns. Meanwhile, Defendants—in particular, Burck—continued efforts to concoct a justification for the August 2015 decision to terminate Plaintiff's employment.

13.    When Plaintiff complained to Corey via email about Burck's apparent sabotage of her efforts to find or maintain billable work in April 2016, Defendants retaliated immediately by setting a meeting with Plaintiff and Corey to discuss her concerns (as Corey was not only the other co-managing partner of the office, but also the designated EEO and harassment contact person). At the May 4, 2016 meeting, Corey ambushed Plaintiff by having Burck attend the meeting, at which point they announced that Plaintiff would not receive partnership consideration and that she should "move on" from the law firm, although they provided no justification for the decision or any specifics about when or how Plaintiff should "move on".

14.    When Plaintiff followed up with Corey to ask for a meeting with him alone (as she had anticipated the May 4 meeting would be) and to provide additional examples of Burck's efforts to sabotage her, Quinn Emanuel responded by flatly denying and dismissing her concerns. In a June 2016 meeting, Corey first told her that her end-date would be July 2, 2016, which was only weeks away.

15.    After Plaintiff's employment counsel sent Quinn Emanuel another written complaint on June 30, 2016 concerning Defendants' discriminatory and retaliatory conduct, including citations to Burck's racist and homophobic references about minority attorneys, such as his and O'Neil's frequent use of the terms "he-she" and "tranny" in reference to a minority male attorney. A week and a half later, Defendants retaliated against Plaintiff by suddenly cancelling its representation of Plaintiff's father-in-law, Ngozika Nwaneri, Senior (the 70-year-old father of Plaintiff's husband, Ngozika Nwaneri, Junior), based on a falsified balance for a nominal amount

of money that had been outstanding for less than 30 days.  Quinn Emanuel went to extreme lengths to ensure its withdrawal from the case, including refusing to accept any payment on the purported outstanding balance and repeatedly swearing the bill amount was correct even though it was wrong on its face and in breach of their fee agreement (months later, Quinn Emanuel later admitted the billing error, and only in the context of the bar complaint Mr. Nwaneri, Senior filed against Corey regarding his and the firm's improper cancellation of its representation based on a falsified bill).

16.     Quinn Emanuel's pattern of retaliation continued and escalated after Plaintiff filed the attached discrimination charge against Defendants (specifically naming Defendants Burck, Shaffer, and Corey) with the Equal Employment Opportunity Commission ("EEOC") and related state agency in February 2017.  See Ex. 1 (discrimination charge marked as received by February 28, 2017).  Less than 3 days after receiving the charge, Quinn Emanuel began drafting its complaint against Plaintiff's father-in-law seeking the same fees Quinn Emanuel refused to accept or to correct in 2016 when seeking to withdraw as counsel.  Defendants filed their retaliatory arbitration with JAMS on March 22, 2017, approximately 3 weeks after Quinn Emanuel received Plaintiff's discrimination charge.

17.     Although Quinn Emanuel is a 700-lawyer law firm with gross annual revenues of approximately $2 billion (and $1.6 billion in 2016, according to AmLaw), Defendants' lawsuit against Plaintiff's father-in-law sought only $20,000, and Defendant deployed a team of approximately 10 attorneys (employed at Quinn Emanuel) to extract payment.  Throughout the arbitration lawsuit and related proceedings, Quinn Emanuel has also demanded over $500,000 in additional fees to compensate itself (at market rate and then some) for its efforts to collect a $20,000 disputed fee.

18.    Defendants then abused the arbitration lawsuit process to retaliate against Plaintiff directly, including ridiculous demands for her to provide discovery and a third-party deposition in the case, even though such testimony is ever necessary from a former associate in a fee dispute, particularly not while an EEOC charge is pending against the law firm, and when the fee dispute arose after her departure. Equally retaliatory (and ludicrous) was Quinn Emanuel's demand that Plaintiff—who was not a party in the dispute—pay for the costs of the third-party deposition Quinn Emanuel relentlessly sought (over Mr. Nwaneri, Senior's and Plaintiff's objections). Defendants also used Quinn Emanuel's arbitration lawsuit to harass Plaintiff in various ways, including by admittedly hiring a private investigator to follow and stalk Plaintiff and her close family members for the alleged purpose of serving their third-party deposition subpoena, which had not yet been issued, among other efforts by Defendant to intimidate, humiliate, and silence Plaintiff after her filing of the discrimination charge.

## II.    JURISDICTION AND VENUE

19.    Plaintiff brings this action against Defendants Quinn, Emanuel, Urquhart, & Sullivan, LLP, William Burck, Derek Shaffer, and Jon Corey, alleging claims of race, gender, and maternity leave discrimination and retaliation in violation of federal and state laws including 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1985(3) ("Section 1985(3)"), Title VII of the Civil Rights Act of 1964, the Family Medical Leave Act ("FMLA"), the D.C. Family Medical Leave Act ("DCFMLA"), the D.C. Human Rights Act of 1977 ("DCHRA"), and state tort laws prohibiting wrongful termination and tortious interference with employment relationships.

20.    This Court has subject matter jurisdiction over Plaintiff's claims under federal law pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's DCHRA and other

state law claims because they are so related to the federal claims in this action that they form part of the same case and controversy under Article III of the United States Constitution.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

III.   **PARTIES**

22.     Plaintiff Crystal B. Nwaneri joined Quinn Emanuel's Washington, D.C. Office as an associate in 2012 and was employed by the firm until 2016.  During all relevant times, Plaintiff was an African-American female "employee" as defined by Title VII, the DCHRA, the EPA, and the FLSA.

23.     Defendant Quinn, Emanuel, Urquhart, and Sullivan LLP ("Quinn Emanuel") is a California limited liability partnership and a business litigation law firm with over 700 attorneys in its employ.

24.     Defendant William Burck ("Burck") is a partner at Quinn Emanuel and the co-managing partner of the firm's Washington, D.C. office.  Upon information and belief, Burck actively and knowingly engaged in, aided, abetted, and coerced discriminatory and unlawful actions against Plaintiff.

25.     Defendant Jon Corey ("Corey") was a partner at Quinn Emanuel and co-managed the Washington, D.C. office with Burck until early 2018, when he resigned from the state bars of the District of Columbia, New York, and California during the pendency of the D.C. Bar's investigation of the bar complaints Mr. Nwaneri, Senior filed against him.  Upon information and belief, Corey actively and knowingly engaged in, aided, and abetted discriminatory and unlawful actions against Plaintiff.

26.     Defendant Derek Shaffer ("Shaffer") is a partner at Quinn Emanuel in the Washington, D.C. office and works closely with Burck.  Upon information and belief, Shaffer actively and knowingly engaged in, aided, abetted, and coerced discriminatory and unlawful actions against Plaintiff.

IV.     **FACTUAL ALLEGATIONS**

27.     Plaintiff, an African-American woman, graduated with distinction from Georgetown University and Georgetown University Law Center.  She joined Quinn Emanuel's D.C. office in 2012 with substantial legal experience, including her completion of two federal judicial clerkships on the United States Court of Appeals for the Seventh Circuit and the United States District Court for the District of South Carolina.

28.     At all relevant times, there were no partners who identified as African-American or Black in the Washington, D.C. office.  Of the 700 attorneys employed by the law firm, fewer than 10 were African-Americans according to Quinn Emanuel's self-reported demographics to the NALP directory.  Upon information and belief, Plaintiff was the most senior African-American female attorney at the law firm for the majority of her tenure there.

29.     Although Plaintiff was an associate in the D.C. office, she had little exposure to the partners in the D.C. office for her first two years at Quinn Emanuel.  Between 2012 and 2014, Plaintiff primarily worked with partners located in other offices or on matters that required her to work away from the D.C. office, such as her 2012-2013 work on matters in New York.  Similarly, she spent most of 2014 working on a tax matter in Europe, which required her to spend the vast majority of each month in Switzerland, at a time when Plaintiff was pregnant with her first child

and also coordinating the medical care and legal affairs of her terminally ill mother who resided in South Carolina.

30.     In September 2014, Plaintiff gave birth, and in early October 2014, Plaintiff's mother away.  Plaintiff took the statutorily provided FMLA leave and returned to the D.C. office in early 2015, looking for billable work on matters located in D.C. and preferably with D.C.-based partners, with whom Plaintiff had had limited exposure.

31.     Shortly after Plaintiff's returned to the D.C. office from leave, she received an exemplary annual performance review at her April 2015 review meeting.  The feedback was wholly positive, and the review did not contain any negative comments or identify any areas for improvement.  Rather, the partners complimented Plaintiff's substantive work and teamwork, leadership, client relations, and commitment to the firm.  The reviewing partners also stated that she was "on track" and should keep up the good work.

32.     On April 27, 2015, Plaintiff formally deferred partnership consideration until the following year, as allowed by Firm policy.  Plaintiff's partner mentor agreed with Plaintiff's decision in light of Plaintiff's need to cultivate relationships with D.C.-based partners and to develop a more complete portfolio of substantive work and business development.  He confirmed that the firm would not consider Plaintiff for partnership until the following year (approximately November 2016).

33.     As explained in this Complaint and the attached discrimination charge, Defendants discriminated against Plaintiff beginning with her first case assignment after she returned from maternity leave in 2015.  Defendants subjected Plaintiff to discrimination based on her race, gender, and recent return from maternity leave by treating Plaintiff substantially worse than her white and male peers and creating a hostile work environment for Plaintiff.  After Plaintiff

complained to firm management about the disparate treatment and harassing environment Shaffer and others had subjected her to, Defendants began a relentless campaign of retaliation against Plaintiff.

34.     As one example of Defendants' retaliation, just four months after Plaintiff's April 2015 performance review and deferral of partnership consideration until the next year, Quinn Emanuel partners in the Washington, D.C. office with whom Plaintiff had never worked before decided not only that Plaintiff would not be promoted to partner (according to Defendant Shaffer in a July 7, 2015 meeting with Plaintiff), but also decided in August 2015 to terminate Plaintiff's employment.  Despite having no lawful justification for their decision, Defendants Burck and Corey (the D.C office's co-managing partners at the time) communicated their decision to firm headquarters in California and the law firm's founder, John Quinn, in or around August 2015.

35.     Defendants then engaged in a post hoc campaign to justify their earlier decision, including, but not limited to, extensive efforts to intentionally depress Plaintiff's billable hours, subject her to unwarranted and relentless scrutiny, make false and contrived allegations about Plaintiff's performance to lower her next performance review, dissuade other partners from working with her, publicize their plan to terminate Plaintiff to other attorneys (while withholding that information from Plaintiff herself), ensure that Plaintiff was removed from new matters that had been assigned to her, and other acts intended to interfere with Plaintiff's work conditions, performance, and productivity.  Defendants' attempts to find or fabricate a post hoc justification for their termination decisions continued until May 2016, when Defendants finally informed Plaintiff of their decision to terminate her employment and deny her partnership consideration due to her inability to secure billable work and low hours in 2016—i.e., the very conditions Defendants had created.

12

## 2015 RETURN FROM MATERNITY LEAVE: FIRST D.C.-BASED CASE

36.     In early 2015, Plaintiff returned to the law firm from bereavement and maternity leave taken pursuant to the FMLA and DCFMLA.  Quinn Emanuel made little efforts to assist with her re-integration into the firm or her search for billable work in the D.C. office.  In March 2015, she was staffed to her first D.C.-based case with two partners she had never worked with before: Burck, who was the relationship partner on the matter, and Shaffer, who ran the matter day-to-day.  Shaffer is widely known as difficult to work with, prone to tantrums, and especially venomous towards minorities and women.

37.     During the four months Plaintiff worked with Shaffer, he was extremely verbally abusive and hostile towards Plaintiff (including publicly degrading her without cause), while treating similarly situated white and male attorneys on the case team in the opposite manner.  From the beginning of the case, Shaffer directed Plaintiff to report to a white male associate who was two years her junior and had only recently joined the law firm.  Shaffer also frequently subjected Plaintiff's performance to greater scrutiny and unwarranted criticism than her white and male peers, assigned more favorable work to Plaintiff's white and male peers, and interacted with the white and male members of the case team in a manner starkly different that his interaction with Plaintiff.  While Shaffer protected and avoided confrontations with Plaintiff's white and male peers (e.g., avoiding asking a white male associate about his tardiness in circulating a draft brief, and then answering on the white attorney's behalf when Plaintiff inquired about the status), Shaffer went out of his way to be confrontational with Plaintiff (e.g., publicly denigrating Plaintiff over email without cause, verbal abusive and tantrums so loud that other employees could hear his screaming behind closed doors), and aggressive behavior.

38.     In April and May 2015, Plaintiff complained to Quinn Emanuel about Shaffer's abusive and disparate treatment to two partners, one of whom was located in the D.C. office and the other in a different office. Shortly after Plaintiff's meeting with the D.C. partner, Shaffer's conduct worsened as he became more verbally abusive towards Plaintiff, punitively changing the case schedule (*e.g.,* insisting that non-essential assignments be completed at times he was fully aware conflicted with Plaintiff's pre-existing family and childcare responsibilities), and closely scrutinizing Plaintiff's activities and attendance (*i.e.,* making repeated unannounced visits to Plaintiff's office and/or back-to-back phone calls to Plaintiff and her secretary, even when there were no time-sensitive or pending issues).

39.     In particular, during a two-month period when the case team's other two associates were away at other trials, Plaintiff singularly handled the vast majority of the casework, including case management and substantive work, discovery requests, correspondence with opposing counsel, document collection and review, fact development, and expert retention. But despite Plaintiff's productivity and the client's positive feedback, Shaffer rarely acknowledged Plaintiff's efficient management of the matter or her handling of three associates' work. Instead, Shaffer looked for opportunities to publicly humiliate and criticize Plaintiff without cause, while demanding Plaintiff complete more work under tighter time constraints.

40.     Conversely, Shaffer made frequent allowances for the critical errors of white and male associates on the case team, including willingly ignoring a white male associate's weeks' long tardiness on an external deadline for a brief (which delay ultimately required the client to request a formal extension from the court) and thanked him profusely when he finally circulated the draft. But when Plaintiff requested a brief extension on an internal deadline due to her heavy workload on the case (and Shaffer's insistence on an inefficient approach for a related project) in

June 2015, Shaffer went ballistic, openly ridiculed Plaintiff in front of the entire case team, and immediately reassigned the project to a white male associate who had recently returned to the case team.

41.    Specifically, while Plaintiff was simultaneously working on multiple case assignments (during the other two associates' absence from the matter), Shaffer tasked Plaintiff with conducting more than 20 on-site fact interviews with the client's employees, without any associate support and under a short deadline.  Plaintiff warned Shaffer of several key employees' lack of availability to meet in-person and suggested conducting interviews by telephone, but Shaffer insisted the interviews be conducted on-site.  As a result of scheduling conflicts and Shaffer's insistence on in-person interviews, Plaintiff needed a short (i.e., hours-long) extension on an internal deadline for a related assignment.  In a series of emails to the entire case team, Shaffer blamed Plaintiff for the short delay, falsely claimed Plaintiff was inexplicably "radio silent,"[1] denigrated her proposed strategy for completing the remaining assignments as a "joke," and abruptly reassigned the nearly complete assignment to a white male associate who had recently returned to the case team.

42.    Plaintiff complained to the firm's management about Shaffer's disparate and abusive treatment several times in 2015.  Each time Plaintiff opposed or reported Shaffer's conduct, Quinn Emanuel retaliated against Plaintiff instead of addressing or investigating her concerns.  For example, Plaintiff complained to Burck and Corey about Shaffer's particularly

---

[1] Shaffer was not only aware that the delay was caused by his insistence that the interviews be conducted in person at the client site, but Shaffer also knew that Plaintiff was out of the office attending a summary judgment hearing in federal court (and therefore without telephone and email access).   In fact, Shaffer had asked Plaintiff to escort three summer associates to the hearing, which he knew Plaintiff would be attending days in advance, and emailed Plaintiff the morning of the hearing to confirm those plans.

explosive June 2015 tirade, including a July 7, 2015 email to Burck (the partner responsible for the matter) and Shaffer noting Shaffer's disparate and abusive treatment towards her and highlighting the June 2015 incident in particular. Plaintiff's July 7 email made clear that Shaffer's mistreatment of Plaintiff was unwarranted, unwelcome, unfair, and disproportionately directed to Plaintiff. In particular, Plaintiff identified her race (as the only African-American on the case team) as the apparent reason for Shaffer's discriminatory conduct, and asked Shaffer to treat her with the same respect as he afforded her white and male colleagues.

43.    Again, rather than investigate Plaintiff's concerns, Quinn Emanuel made no efforts to resolve Plaintiff's complaints. Burck never responded to Plaintiff's July 7, 2015 email. Nor did he show up to Plaintiff's meeting with Shaffer later that day, which was intended to discuss outstanding case issues such as Shaffer's particularly explosive and humiliating tantrum in June 2015. Instead of discussing or making any attempt to resolve those issues, Shaffer flew into another rage during the meeting, verbally attacked Plaintiff, and gloated that he and Burck had already decided that Plaintiff would not be promoted to partner, among other things. Plaintiff repeatedly asked why that decision had been made; what deficiencies or problems supported their decision; and why Shaffer was in a position to make such a decision given her earlier deferral of partnership consideration (which the firm had approved in April, partly due to Plaintiff's recent return from maternity leave).

44.    Shaffer could not provide any specific context or examples during the meeting, nor could he explain their justification for reaching such a decision, as this case was the first time Plaintiff ever had worked with Shaffer or Burck; her role on the matter only lasted 4 months; and Plaintiff had just received a positive "on track" annual performance review just two months earlier.

45.     After the meeting, Shaffer and Burck retaliated against Plaintiff again by drastically reducing her role on the case, marginalizing her, and transferring her case assignments and supervisory responsibilities to a white male associate.

46.     After the disastrous July 7 meeting with Shaffer, Plaintiff complained about Shaffer's disparate treatment and harassment to firm management again, this time contacting Corey, who was the firm's designated EEO and harassment contact person and co-managing partner of the D.C. office at the time.  Plaintiff met with Corey in mid-July to discuss Shaffer's discriminatory and harassing conduct including the blow-up in June 2015, Shaffer and Burck's marginalization of Plaintiff after her July 7 email and meeting with Shaffer, and Shaffer's claim that he and Burck had already decided that Plaintiff would not make partner at Quinn Emanuel. Corey brushed Shaffer's statements off, saying Shaffer was a "baby partner" and that Plaintiff should ignore Shaffer's comments about denying her partnership.   He dismissed Shaffer as "difficult" to work with, and assured Plaintiff that Shaffer's feedback about the 4-month project would not be included in her performance review for that year.  Less than a week after Plaintiff's meeting with Corey, however, Burck and Shaffer removed Plaintiff her from the matter entirely without notice and replaced her with another white male associate.


### DEFENDANTS' JULY AND AUGUST 2015 DECISION TO TERMINATE PLAINTIFF'S EMPLOYMENT AND DENY HER PARTNERSHIP CONSIDERATION

47.     As Plaintiff eventually learned, Defendants had, in fact, agreed in July to deny Plaintiff partnership consideration, as Shaffer admitted in his July 7 meeting with Plaintiff.  In August 2015, Defendants also agreed to terminate Plaintiff's employment.  Upon information and belief, Defendants Burck and Corey announced their decision to the firm's founding partner John

Quinn, notwithstanding that: (1) they had no justification for their decision to terminate Plaintiff; (2) Plaintiff had postponed partnership consideration until the next year, as per the firm policy, and which her partner mentor had already approved in April 2015; and (3) Plaintiff's annual performance review, which the firm provided in April 2015, was entirely positive and indicated she was on-track for promotion.

48.    As Plaintiff explained in her November 28, 2017 letter to the EEOC: "Substantial evidence shows that, in addition to distributing his "idiot" emails (dated Aug. 2015) Burck and Corey (the two managing partners of the DC office) decided to terminate me in August 2015, and acted in concert with others at Quinn Emanuel, including firm managing partner John Quinn, to unlawfully terminate me. See, e.g., John Quinn's November 12, 2015 email to Corey and Burck, titled "has Nwaneri been asked to leave yet?", which makes clear that their decision was finalized long before. In response, Corey confirms "this one is on Burck's plate and will be done soon"; John Quinn replies: 'needs to be done.'"

49.    Like Defendants' decision to deny Plaintiff partnership consideration, the decision to terminate Plaintiff's employment was also made in retaliation for her complaints about Shaffer, including the July 7 email opposing Shaffer's discriminatory and disparate treatment of Plaintiff, which Plaintiff believed were racially motivated.

50.    Defendants made extensive efforts to manufacture a justification for their adverse decisions, particularly because they had already informed John Quinn of their plan but still lacked any legal justification.  Defendants went to great lengths to find or concoct a reason for their July and August 2015 decisions to terminate Plaintiff and deny her any partnership consideration, including, but not limited to, intentionally suppressing Plaintiff's billable hours, depriving her of and interfering with her existing billable assignments, dissuading other partners from working with

her, and subjecting Plaintiff to harassment and hostilities by Defendants and other employees they encouraged to follow suit.

## "NEW" AUGUST 2015 CASES DESIGNED FOR FAILURE

51.     Meanwhile, as Defendants attempted to manufacture a justification for their July and August 2015 decisions, they kept Plaintiff in the dark about their plans to terminate her employment for nearly a year. Defendants, particularly Burck and Corey, actively misled Plaintiff regarding her status at the law firm. In addition to Corey's July 2015 assurances that Shaffer's statements (about his and Burck's decision that Plaintiff would not make partner at the firm) were false and should be disregarded because Shaffer was a "baby partner," Burck also misled Plaintiff about her status at the firm.

52.     In August 2015, after removing Plaintiff from the case with Shaffer, Burck dismissed Shaffer's discriminatory and harassing conduct toward Plaintiff on the earlier case as "a personality conflict" and assigned Plaintiff to two of his smaller matters. In Plaintiff's first meeting with Burck about the new cases, Burck indicated that that he did not have lingering concerns about Plaintiff's performance on the previous case and that the new matters were a fresh start.

53.     However, it became apparent that the two August 2015 matters were not "fresh start[s]" but instead were designed for failure as Burck attempted to concoct a justification for his July and August 2015 decisions regarding Plaintiff's employment. For example, there was no role for Plaintiff on either of the small 3-person teams, which were already staffed with attorneys at Plaintiff's same or similar seniority level; further, Burck refused to define or provide a clear role when Plaintiff asked.

54.     Moreover, unbeknownst to Plaintiff, Burck was actively undermining, demeaning, and sabotaging Plaintiff's role on the new matters. For instance, within a week of staffing Plaintiff to one of the cases (and before she had done any work on the matter), Burck repeatedly degraded Plaintiff to the white male associate already assigned to the case, Benjamin O'Neil. Burck repeatedly derided Plaintiff as an "idiot, confirmed" and "fucking…stupid" to O'Neil. Unsurprisingly, O'Neil (the associate responsible for the Colombian "cocaine and guns" necktie "joke") happily parroted Burck's sentiments back to Burck and to others. insults which O'Neil unsurprisingly parroted to others.

55.     In addition to degrading Plaintiff behind her back, Burck and other Defendants also actively enlisted Plaintiff's colleagues on the new matters to harass Plaintiff and to interfere with her work. For example, Burck literally told O'Neil to "fight" with Plaintiff to and "be a man" in his interactions with Plaintiff. These comments empowered and emboldened O'Neil to be extremely aggressive and abusive towards Plaintiff, as Plaintiff's November 28, 2017 letter also described:

> "Additionally, Burck specifically engendered hostility towards me and he and others, created a hostile work environment by encouraging others (typically white, male, and a member of Burck's fraternity) to "fight" with me, including Ben O'Neil (who was an associate at the relevant time). I complained to Burck in Oct. 2015 about O'Neil's confrontational and harassing behavior; instead of addressing the issues I raised, Burck emboldened O'Neil's hostility by regularly and viciously insulting me to O'Neil (e.g., Burck's "idiot" emails). Even worse, Burck directed O'Neil to "fight" with me and to "be a man" in his interactions with me, to which O'Neil replied "gladly"."

56.     In addition to exhibiting extreme hostility toward Plaintiff, O'Neil challenged every suggestion Plaintiff made on case strategy, even to the client's dissatisfaction (e.g., O'Neil decrying Plaintiff's recommendation to attend certain key depositions as "fucking stupid," while the client later expressed disappointment that the team had not taken the approach Plaintiff

suggested), and to the potential detriment of the client (e.g., O'Neil's insistence that the case team blindly produce thousands of the client's unreviewed documents to a governmental agency, at the risk of greater criminal and civil exposure, over Plaintiff's repeated objections).

57.   Unaware that Burck's insults and mockery of Plaintiff—along with his directive that O'Neil "fight" with Plaintiff—were fueling O'Neil's vitriolic behavior, Plaintiff met with Burck in October 2015 to discuss her concerns about O'Neil's hostile behavior towards her, which diverged entirely from his interactions with the white junior associate on the matter.  Burck told Plaintiff not to worry about it, encouraged her to continue working collaboratively with O'Neil and said that her work on the matters was "good" and that he was satisfied with her performance. Burck also gave Plaintiff additional assignments on the matter with O'Neil, which Plaintiff reverted to him the next day.

58.   But Despite Burck's representations at the meeting, he phased her out of both matters a few weeks later without explanation, much like he had done on the earlier case with Shaffer.  Upon information and belief, his removing her from the cases was in furtherance of Defendants' plan to suppress her hours in an attempt to justify their earlier plan to terminate Plaintiff's employment.

## DEFENDANTS' CONTINUING EFFORTS TO CREATE POST HOC JUSTIFICATION FOR JULY AND AUGUST 2015 ADVERSE EMPLOYMENT DECISIONS

59.   In Defendant's continuing efforts to find or manufacture a justification for their July and August 2015 decisions to terminate Plaintiff's employment and deny her promotion without consideration, Defendants not only undermined Plaintiff (as Burck had done on the new August 2015 cases), but they also subjected Plaintiff to an unprecedented level of scrutiny and went to great lengths to sabotage her billable hours.

60.     In particular, Defendants continuously sought out negative information about Plaintiff and scrutinized her work more closely than others, even tasking other employees to surveil Plaintiff's activities and report back.  Upon information and belief, Burck in particular enlisted employees including O'Neil and others to closely monitor Plaintiff's activities and to look for negative information about her.

61.     Likewise, Defendants themselves went out of the way to search for negative feedback about Plaintiff, even after her work on the August 2015 cases ended.  Burck and Shaffer in particular would approach other partners to ask about cases Plaintiff was working on or had previously worked on fishing for negative feedback, including matters from other offices in which neither Burck nor Shaffer had any involvement.

62.     These inquiries were made outside of the firm's established annual performance review process and general practices.  In the typical performance review process, partners who have worked with an associate in the current review year submit written reviews about their experience.  A designated partner distills those reviews into a review summary, which is provided to the associate at his or her annual performance review meeting. Upon information and belief, Quinn Emanuel has never subjected any white or male attorney at the law firm to such intense scrutiny outside the established performance review process, in particular by a managing partner.

63.     In particular, in Fall 2015, Burck unilaterally inserted himself into Plaintiff's work relationships by independently identifying and approaching partners Plaintiff had previously worked for in search of "proof" that would justify Defendants' earlier 2015 decisions, all of which occurred outside the firm's performance review process. In March 2016, Burck subjected Plaintiff to even greater scrutiny by demanding that she provide him the names of all partners she had previously done work for so that he could conduct another ad hoc review of Plaintiff's

performance,  Even though the law firm's performance review process for the 2015 year had already concluded, Burck went out of his way to approach other partners (some of whom Plaintiff had not worked with in 3 years) in search of any negative information he could find about Plaintiff.

64.    Quinn Emanuel's heightened and intense scrutiny, including Burck's insistence on personally talking to partners with whom Plaintiff had worked was not only an effort to justify Defendants' August 2015 decision to terminate Plaintiff's employment, but also disparate treatment.  As Plaintiff explained her November 28, 2017 letter to the EEOC, Quinn Emanuel's conduct towards Plaintiff appeared to be racially motivated, as no other white or male attorneys at the firm were subjected to this level of scrutiny or deprived of the benefits of the law firm's written policies:

> "With respect to Quinn Emanuel's "low hours" excuse, substantial evidence shows that many other similarly situated white and male associates with low hours were provided their reviews, helped to find billable work, and were not terminated despite low hours. Additionally, there is clear evidence that Burck and others intentionally depressed my billable hours and undermined my efforts to get or retain billable work.  For instance, Burck and others needlessly gossiped to partners and associates about supposed deficiencies with my work, while withholding this information from me (refusing to provide a formal review for the 2015 year, in complete disregard for the established associate review process and procedures in my case).  Similarly, Burck and others broadcasted the Aug. 2015 decision to terminate me to several partners and associates in September and October 2015—before Burck had even notified me of the (a) the purported problems (Oct. 2015); or (b) the Firm's plan to terminate (May 2016)."

> "In further contravention of Quinn Emanuel's established processes for associate review and partnership deferral procedures, Quinn Emanuel and Burck subjected me to substantially greater scrutiny than my white and male colleagues and decided to terminate my employment outside of the firmwide established review and partnership deferral process.  Burck in particular went out of his way to discredit me among partners and my peers, inside and outside the DC office.  Evidence shows that Burck intentionally and repeatedly sought out negative information about me to bolster Quinn Emanuel's Aug. 2015 decision to terminate.  Burck began fishing for examples and proof of my alleged deficiencies as early as Sept. 2015, and his emails doing the same in March 2016 primed the recipients to provide negative feedback through misleading information (e.g., claiming that the office was "evaluating" me due to my "seniority" and that I allegedly identified the recipients as partners I worked with "extensively", although I specifically told Burck that I had only limited exposure to those partners).  The peculiar circumstances of Burck's

inquiries signaled that Burck and/or the DC office were planning to terminate me, i.e., a comanaging partner randomly contacting other partners in other offices and outside the review period and established process (in which Human Resources collects such feedback), about one associate in particular, and regarding work dating back 3 years and outside the scope of the 2015 review year) is an obvious red flag."

65.     Additionally, Quinn Emanuel and Burck affirmatively thwarted Plaintiff's efforts to obtain other billable work by suggesting to multiple partners that they should not work with Plaintiff and that Quinn Emanuel planned to terminate her employment.  Announcing the firm's plan to terminate Plaintiff to others (while hiding this information from Plaintiff herself) dissuaded other partners from working with Plaintiff and cause Plaintiff's billable hours to fall even lower.

66.     Upon information and belief, in late 2015 and 2016, Defendants Burck and Shaffer affirmatively prevented Plaintiff's participation in at least 3 billable matters Plaintiff had been invited to join or was already working on.  The assignments were rescinded suddenly at the urging of Burck and Shaffer.

67.     On more than four occasions in 2016, Plaintiff went to Corey to express her grave concerns about Burck's intense scrutiny and her rapidly declining billable hours, as she searched for additional billable work.  In April and May 2016, Plaintiff specifically talked to Corey—the designated EEO contact person for harassment issues in the D.C. office—about Burck and Shaffer's potential involvement in the sharp decline in her billable hours.  In particular, Plaintiff noted their disparate treatment of her as compared to her white and male colleagues, that their targeted scrutiny of her work was outside the review cycle, that Burck and O'Neil had frequently insulted and made demeaning comments about Plaintiff, and that Burck and Shaffer's conduct was interfering with Plaintiff's ability to obtain or retain other billable work.

68.     In response to Plaintiff's April 2016 and May 2016 complaints regarding Burck's interference with her work, Corey purported to set up a meeting with Plaintiff on May 4, 2016 to

discuss her concerns.  When Plaintiff showed up to the meeting, she provided Corey with a 7-page memorandum about these issues, and sat down to discuss possible solutions with him.  To her surprise, Corey immediately ambushed Plaintiff by telling her for the first time that Burck (who was supposed to the subject of the meeting) would also be attending the May 4 meeting.

69.    Rather than discussing the discriminatory and unlawful conduct Plaintiff complained about, when Burck arrived a few moments later, Corey and Burck abruptly informed Plaintiff that she "would not make partner" and should "move on" [from Quinn Emanuel]. Shocked, Plaintiff asked repeatedly why she would not be considered for partnership—as agreed in April 2015; why the firm reached that decision after her glowing performance review; and why the firm was denying Plaintiff the opportunity to stay longer (an option they have commonly extended to white and male attorneys in the D.C. office to develop their practice before the firm's partnership consideration), among other things.  Corey and Burck refused to answer any of Plaintiff's questions.

70.    Likewise, neither Corey nor Burck would provide Plaintiff with any part of her performance review that year, despite Plaintiff asking for the information 3 times.  Burck refused to answer, and Corey declined, claiming that he did not want to "burden" her with the current year's review.  Neither Corey nor Burck provided an end-date for Plaintiff's employment or any other specifics; at the end of the meeting, Corey said he would consider the issues outlined in her May 4, 2016 memorandum and let her know the firm's final position.

71.    Plaintiff followed up with Corey several times in May 2016 to clarify his May 4 message about her "moving on" and the status of her father-in-law's case with the law firm, including providing him with specific examples of Burck, Shaffer, and O'Neil discriminatory and offensive conduct about her and other female attorneys (including Burck's denigration of Plaintiff

by referring to her as an "idiot" prior to her performing any work on the August 2015 cases he had just staffed her on and his vulgar discussion of other female attorneys' bodies, see ¶ 4).

72.    But rather than investigate Plaintiff's reports of discriminatory treatment, Quinn Emanuel ignored Plaintiff's complaints and did nothing to investigate.  In fact, Corey refused to discuss any of these issues with Plaintiff until Mr. Nwaneri, Senior made another payment for legal services (although he had been making monthly payments ranging from $5,000 to $9,000 since the beginning of the year).

73.    Only after Plaintiff's father-in-law rendered an additional payment of $5,500 at the beginning of June, Corey finally agreed to meet with Plaintiff on June 6, 2016.  At that meeting, Corey informed Plaintiff that the law firm's decision to terminate her employment was final and that her last day would be July 2, 2016 (which was only three weeks away).  Plaintiff asked why Quinn Emanuel was giving her such short notice of her end date and told Corey that it seemed Quinn Emanuel was accelerating the timeline of her departure due to her most recent complaints regarding Burck.  Corey refused to answer any of her questions, and declined again to provide Plaintiff with any part of her performance review for that year, despite her asking again at the June 6 meeting.

74.    Although Corey told her that her last day at the firm would be July 2, 2016, Quinn Emanuel sent its last paycheck in June 2016, and never paid Plaintiff for any days in July, nor did Quinn Emanuel compensate Plaintiff for the more than four weeks of paid vacation time she had earned and accrued that year.

<u>RETALIATORY WITHDRAWAL FROM FATHER-IN-LAW'S CASE</u>

75.    In further retaliation for Plaintiff's protected complaints about discrimination, on July 12, 2016, Quinn Emanuel suddenly cancelled its representation agreement with Plaintiff's

father-in-law—less than 2 weeks after Plaintiff's departure from the firm, 1 month after Corey demanded and received another payment of $5,500 before meeting with Plaintiff in June, and days after receiving Plaintiff's final internal complaint about the discrimination and retaliation issues she had previously raised with firm management (by letter of June 30, 2016 through her employment counsel). The timing of Defendants' sudden cancellation of its representation agreement and its purported reasons for doing to suggested the move was yet another retaliation against Plaintiff for her complaints about Defendants' discriminatory conduct and wrongful termination.

76.     Plaintiff introduced Mr. Nwaneri, Senior, a 70-year-old to the law firm, and Corey specifically, in 2014 when he was seeking representation in a small banking and property matter. He retained the firm to represent him as the plaintiff in a small banking and property matter. Corey was the partner responsible for the matter and the named signatory on the representation agreement. He regularly made monthly payments between $5,000 to $9,000 (and had already paid Defendants $25,000 in fees in 2016, including a payment of $5,500 in early June 2016). Just a few weeks after his June 2016 payment, and 10 days after receiving Plaintiff's June 30 complaint, Quinn Emanuel suddenly decided to withdraw as his counsel, and claimed their decision was based on a fabricated—and now admittedly wrong—outstanding bill for a nominal amount of disputed fees.

77.     Quinn Emanuel claimed its July 2016 withdrawal was due to outstanding legal bills, but the billing dispute was clearly pretextual and based on a falsified bill for a nominal amount of money, which Defendants had grossly inflated in breach of the clear terms of Mr. Nwaneri's retainer agreement. Corey, who was the partner responsible for Mr. Nwaneri's case and the named signatory on Quinn Emanuel's retention agreement, sent the firm's first and only notice to Mr.

Nwaneri about the alleged billing issue on July 12, only a few days Defendants received Plaintiff's June 30 letter, and refused to send Mr. Nwaneri the underlying bill until July 18—a week after Defendant first informed Mr. Nwaneri of the fabricated billing issue, and days after Corey filed a motion to withdraw with the court where Mr. Nwaneri's matter was pending.

78.     Mr. Nwaneri notified Corey immediately that the "outstanding" amount was recent and grossly exaggerated (because Defendants had not applied a contractually obligated 33% discount). Even more, Quinn Emanuel—a global law firm with approximately $2 Billion gross annual revenues—had dropped him as a client over a mere $30,000 (that was falsely inflated due to their accounting errors). Despite Corey's role as the relationship partner for the matter throughout the time Mr. Nwaneri, Senior was a client at the firm, he became callous and antagonistic towards Mr. Nwaneri in their brief communications about Defendants' sudden cancellation of the representation agreement.

79.     First, Corey delayed sending the outstanding amount or the underlying billing document to Mr. Nwaneri for a week, and only emailed the paperwork after the law firm had filed its motion to withdraw. When Mr. Nwaneri asked Corey to correct the obvious accounting error that resulted in $10,000 in extra fees, Corey denied the bills were wrong, refused to correct the obvious error, and cut off communication with Mr. Nwaneri the day after he finally sent the billing information. As Corey's July 20, 2016 email said: "I will not continue to engage with you". Mr. Nwaneri reached out to Corey and Quinn Emanuel several other times to offer payment on the corrected balance (as he had done on a monthly basis for the entire year), Defendants repeatedly refused to accept any payment from him (even refusing to accept any payment at the September 2016 hearing on the motion to withdraw).

80.     Quinn Emanuel's actions were so egregious that Mr. Nwaneri, Senior, was forced to file bar complaints against the D.C. attorneys involved in the law firm's improper withdrawal— including Defendant Corey, who was the partner responsible for Mr. Nwaneri, Senior's representation.   The bar complaints resulted in a lengthy investigation during which Quinn Emanuel finally acknowledged the billing errors and fabricated balance that Defendants had relied as the alleged basis for their decision (which it first announced days after receiving Plaintiff's June 2016 complaint) to cancel the law firm's representation agreement months earlier.

81.     Beyond deciding to cancel Mr. Nwaneri, Senior's representation agreement under the pretext of a falsified outstanding balance, Defendants also retaliated against and otherwise harmed Plaintiff by: (a) making various defamatory misrepresentations about Plaintiff and Mr. Nwaneri, Senior to the state court where his civil case was pending in Defendants' efforts to withdraw as his counsel; (b) violating attorney-client privilege by publicly disclosing Mr. Nwaneri, Senior's confidential retainer agreement with the law firm to  the public by not only filing an unredacted copy of it but also by sending the full agreement directly to Mr. Nwaneri, Senior's adversaries (including the defendant and another company named in the agreement as a potential litigation target); and (c) preventing Mr. Nwaneri, Senior from curing the alleged default, such as refusing to accept any payment towards the falsified outstanding balance (including Quinn Emanuel's refusal on the record at the September 2016 hearing to accept any payment or to continue representation under any circumstances).

82.     Beyond deciding to cancel Mr. Nwaneri, Senior's representation agreement under the pretext of a falsified outstanding balance, Defendants also retaliated against and otherwise harmed Plaintiff by: (a) making various defamatory misrepresentations about Plaintiff and Mr. Nwaneri, Senior to the state court where his civil case was pending in Defendants' efforts to

withdraw as his counsel; (b) violating attorney-client privilege by publicly disclosing Mr. Nwaneri, Senior's confidential retainer agreement with the law firm to the public by not only filing an unredacted copy of it but also by sending the full agreement directly to Mr. Nwaneri, Senior's adversaries (including the defendant and another company named in the agreement as a potential litigation target); and (c) preventing Mr. Nwaneri, Senior from curing the alleged default, such as refusing to accept any payment towards the falsified outstanding balance (including Quinn Emanuel's refusal on the record at the September 2016 hearing to accept any payment or to continue representation under any circumstances).

## RETALIATORY ARBITRATION

83.      Quinn Emanuel's pattern of retaliation against Plaintiff and her close family members escalated further in 2017, immediately after Plaintiff filed a charge of discrimination and retaliation against Defendant (which named the D.C. partners involved in the firm's discrimination and retaliation, including Defendants Burck, Shaffer, and Corey).  Specifically, after Plaintiff filed her discrimination and retaliation charge against Quinn Emanuel on February 27, 2017, Quinn Emanuel—led by Corey—retaliated immediately by preparing to sue Plaintiff's father-in-law just 3 days after receiving their copy of the charge document, according to the billing records of the arbitration.

84.      Quinn Emanuel filed its arbitration lawsuit against Mr. Nwaneri, Senior on March 22, 2017, less than 3 weeks after receiving Plaintiff's discrimination charge.  Even though Quinn Emanuel had used the falsified outstanding balance to drop Mr. Nwaneri as a client in 2016 and refused to correct or accept any payment towards the correct balance, their 2017 arbitration lawsuit was a complete reversal.

85.     Although Quinn Emanuel is a behemoth law firm with gross annual revenues of approximately $2 billion annually (and $1.6 billion in 2016, according to AmLaw), Defendants' lawsuit against Plaintiff's father-in-law sought only $20,000, and Defendant deployed a team of approximately 10 attorneys to extract payment from its former client.  Throughout the arbitration lawsuit and related proceedings, Quinn Emanuel has also demanded an additional $500,000 in fees (for the purported work the law firm's employees expended in Defendant's collection of the $20,000 disputed fee).

86.     Defendants also used their retaliatory lawsuit against Plaintiff's father-in-law to harass Plaintiff directly.  Although Plaintiff had departed the firm 8 months before Defendants filed the arbitration lawsuit and her discrimination charge against Defendants was still under investigation by the EEOC and related state agency, Defendants insisted that discovery from Plaintiff was necessary and demanded that she make herself available for a third-party deposition. It is unheard of for associates to testify in law firm billing disputes—particularly when the law firms are in full possession of all the information necessary to substantiate their claims for fees. To the extent that any such testimony or discovery was necessary, other associates who worked on the matter (and Corey, the engagement partner) were still employed by Defendant at the time and could easily have provided any necessary testimony.

87.     Despite strenuous objections by Plaintiff and Mr. Nwaneri, Senior, Defendants went out of their way to force Plaintiff to testify against her father-in-law while refusing to pay any of the costs associated with third-party deposition (including the statutorily required $40 witness fee) or provide a place for the deposition they demanded.  Nor was Quinn Emanuel willing to be accommodating of Plaintiff's schedule or family responsibilities despite knowing she had

given birth to her second child in May 2017 and was the primary caregiver for a newborn and a

toddler.

88.    Plaintiff detailed the retaliatory nature of the arbitration lawsuit against Plaintiff's

father-in-law in her November 28, 2017 letter to the EEOC:

### Retaliatory Arbitration, Investigation, and Subpoena

"Also during our Oct. 13 call, I mentioned that Quinn Emanuel has engaged in several
retaliatory acts against me and my family since my complaints of discrimination and
harassment, including suing my father-in-law (the firm's former client) in a frivolous
billing dispute just 3-weeks after my Feb. 27 charge was filed.  As mentioned, I was
particularly concerned that Quinn Emanuel's suit (filed on March 22, 2017) was
retaliation in response to my filing the EEOC charge (which I raised with the EEOC
mediator on June 29, before the matter was assigned to you for investigation), and was
particularly alarmed by Quinn Emanuel's September 2017 efforts to compel my
deposition testimony as a non-party, which were invasive, harassing, and intended to
circumvent the EEOC process, among other things.[2]

You asked me why I did not want to be deposed, and I explained again that I was not a
party, my testimony was not needed, and that Quinn Emanuel was using the binding
arbitration and the nonparty subpoena demand to harass me and my family, as evidenced
by, among other things: Quinn Emanuel's refusal to pay any of the necessary expenses
(e.g., the cost of an attorney to defend the nonparty deposition Quinn Emanuel demanded)
or to reimburse me for childcare (despite knowing that I was the primary caregiver to a
newborn and toddler, as became aware during his attendance at the June 29 EEOC
mediation).  Indeed, Quinn Emanuel did not even pay the $40 witness fee despite it being
statutorily required.

In addition, Quinn Emanuel has used the arbitration as a guise for conducting a retaliatory
investigation, including invasive and harassing tactics such as Quinn Emanuel's admitted
use of investigators and private security firms to stalk and surveil me and my close family,
at home (including an address Quinn Emanuel obtained from my EEOC Charge Sheet),

---

[2] "As I explained during our Oct. 13 call, Quinn Emanuel had relentlessly and
needlessly demanded that I—a former employee who had just filed an EEOC
charge against them—appear as their witness against my father-in-law, even though
the purported dispute arose after my termination, my testimony was unnecessary for
their claim, and the small amount at issue and other circumstances revealed
retaliatory animus (e.g., Quinn Emanuel grossed almost $2 Billion last year and was
suing for approximately $20,000, based on bills it refused to correct in 2016 and
never sent to my father-in-law until 2 months into the arbitration)."

school, and work, as well as various other attempts to intimidate, embarrass, and harass me, among other disruptive, invasive, and (on information and belief) illegal tactics.[3] Even worse, Quinn Emanuel's harassment was entirely intended to harass me, as the law firm decided at the last minute that my testimony was not necessary (an about face to their earlier claims when securing the subpoena and responding to my father-in-law's suggestions); after harassing me and my family—including relentlessly pursuing me through investigators, employees, and other agents for months—Quinn Emanuel dropped me as a witness without so much as informing me. I note that their intimidating investigative and surveillance tactics continue, forcing me to involve law enforcement."

89.  To add insult to injury, Defendant's retaliatory and harassing arbitration for $20,000 (that they refused to acknowledge or accept payment for in 2016) has now turned into Quinn Emanuel's demand for $500,000 in self-paid "attorney's fees" for the work of Quinn Emanuel attorneys in pursuit of $20,000 from an elderly former client.

## V.   COUNTS

### COUNT 1:  VIOLATION OF 42 U.S.C. § 1981 ("Section 19881")
### RACE DISCRIMINATION
### (AGAINST DEFENDANT QUINN EMANUEL)

90.  Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

---

"Among other attempts to intimidate and embarrass me, Quinn Emanuel and its agents physically and publicly served their legally deficient subpoena on me over and over—including two times publicly, long after I had already accepted service via email. All of the subpoenas served were legally deficient, and Quinn Emanuel was hostile and malicious with their incessant demands, i.e., badgering me repeatedly me about their non-reimbursed, unnecessary nonparty deposition, particularly on important family dates that were stated clearly in my EEOC charge, including Sept. 19 (my first daughter's birthday), when Quinn Emanuel first notified me of their alleged need for my testimony by serving me its legally deficient nonparty subpoena, demanding I submit for the unnecessary deposition within 10 days' time, and relentlessly pursuing Oct. 2 (the anniversary of my mother's death) as a deposition date, including taunting and mocking me for not having an attorney to represent me at their deposition (which attorney Quinn Emanuel outright refused to pay for)."

91.     In violation of Section 1981, Defendant intentionally discriminated against Plaintiff on the basis of her race by subjecting her to disparate treatment in the terms and conditions of her employment, including compensating her less, refusing to apply Defendant's policies and procedures equally to Plaintiff, subjecting her to heightened scrutiny, demoting and denying Plaintiff promotional and development opportunities, suppressing Plaintiff's billable hours, and other adverse employment actions.

92.     Defendant's unlawful adverse actions, as alleged in this Complaint, were the direct, proximate and pretextual results of race discrimination.

93.     As a result of Quinn Emanuel's conduct alleged in this Complaint, Plaintiff suffered and continues to suffer, monetary damages and non-monetary damages, including but not limited to, the loss of income, lost benefits, other financial loss, as well as emotional distress, reputational damages, humiliation, physical distress, and mental anguish.

94.     As a result of Quinn Emanuel's unlawful conduct, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages; damages for emotional distress; punitive damages; pre- and post-judgement interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

95.     Quinn Emanuel's intentional discrimination and disparate treatment of Plaintiff was willful and malicious, intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, therefore entitling Plaintiff to an award of punitive damages.


### COUNT 2:  VIOLATION OF 42 U.S.C. § 1981
### WRONGFUL TERMINATION
(AGAINST DEFENDANT QUINN EMANUEL)

96.     Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

97.     In violation of Section 1981, Defendant intentionally discriminated against Plaintiff on the basis of her race by wrongfully terminating Plaintiff's employment.

98.     Plaintiff's wrongful termination was a direct, proximate and pretextual result of race discrimination.

99.     As a result of Quinn Emanuel's conduct,  Plaintiff suffered and continues to suffer, monetary damages and non-monetary damages, including but not limited to, the loss of income, lost benefits, other financial loss, as well as emotional distress, reputational damages, humiliation, physical distress, and mental anguish; and such other legal and equitable relief as just and proper.

100.    Quinn Emanuel's unlawful termination of Plaintiff's employment was willful and malicious, intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, therefore entitling Plaintiff to an award of punitive damages.

### COUNT 3:  VIOLATION OF 42 U.S.C. § 1981
### HOSTILE WORK ENVIRONMENT AND HARASSMENT
(AGAINST DEFENDANT QUINN EMANUEL)

101.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

102.    In violation of Section 1981, Defendant intentionally discriminated against Plaintiff on the basis of her race by subjecting Plaintiff to a racially hostile work environment and harassment that was severe or pervasive enough to alter the terms and conditions of her employment.

103.    Defendant Quinn Emanuel is strictly liable for this violation because, as alleged in this Complaint: Defendant had actual and constructive knowledge of the extensive supervisory harassment and hostility Plaintiff was subjected to by her supervisors, including Burck and Shaffer; a reasonable person would find their conduct and the resulting environment to be hostile and abusive; and Defendants' harassment resulted in several adverse employment actions against Plaintiff, including undesirable reassignments, significant reductions in her responsibilities, the suppression of her billable hours, and culminated in Plaintiff's termination.

104.    As a direct and proximate cause of Quinn Emanuel's actions, Plaintiff suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion, promotional opportunities, mental anguish, humiliation, expenses and costs.

105.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages, damages for emotional distress, punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

### COUNT 4:  VIOLATION OF 42 U.S.C. § 1981
### RETALIATION
(AGAINST DEFENDANT QUINN EMANUEL)

106.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

107.    In violation of Section 1981, Defendant Quinn Emanuel intentionally retaliated and discriminated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of race discrimination.

108.    Defendant's retaliatory and discriminatory acts against Plaintiff included, but were not limited to, denying promotional opportunities to Plaintiff, increased scrutiny, and wrongful termination.

109.    Defendant's retaliatory conduct towards Plaintiff and her close family members included, but were not limited to, subjecting them to several tangible adverse actions, including, but not limited to, cancelling its representation agreement with Plaintiff's father-in-law, Mr. Nwaneri, Senior, under the pretense of falsified bills and refusing to correct or accept any payment toward the corrected bills, filing a retaliatory arbitration against Plaintiff's father-in-law for a nominal amount of money immediately after Plaintiff filed her February 2017 discrimination charge alleging Defendant's violation of Section 1981 and other anti-discrimination laws, and Defendant's abuse of its arbitration lawsuit to harass, extort, humiliate, and intimidate Plaintiff and Mr. Nwaneri, Senior.

110.    Defendant's unlawful retaliatory acts are likely to dissuade an employee from engaging in protected activity.

111.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

112.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

113.   Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous, malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## COUNT 5:  VIOLATION OF 42 U.S.C. § 1981
## RACE DISCRIMINATION
### (AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

114.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

115.   Defendants Burck, Corey, and Shaffer intentionally discriminated against Plaintiff in violation of Section 1981 by subjecting her to disparate treatment on the basis of her race in the terms and conditions of her employment, including, but not limited to, refusing to apply Defendant's policies and procedures equally to Plaintiff, subjecting her to heightened scrutiny, demoting and denying her promotional and developmental opportunities, suppressing Plaintiff's billable hours, and other adverse employment actions.

116.   As a result of these Defendants' conduct as alleged in this Complaint, Plaintiff suffered and continues to suffer harm and substantial monetary damages, including, but not limited to, lost earnings, lost benefits, other financial loss.

117.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial non-monetary damages, including, but not limited to, emotional distress, physical pain and suffering, reputational damage, lasting embarrassment, and humiliation.

118.   Defendants' unlawful conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Plaintiff's statutorily-protected civil rights.  As

a result, of Defendants' unlawful conduct, Plaintiff is entitled to lost wages, damages for emotional distress; punitive damages; pre- and post-judgment interest; and such other legal and equitable relief as just and proper.

## COUNT 6:  VIOLATION OF 42 U.S.C. § 1981
## WRONGFUL TERMINATION
### (AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

119.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

120.    In violation of Section 1981, Defendants Burck, Corey, and Shaffer intentionally discriminated against Plaintiff on the basis of her race by wrongfully terminating Plaintiff's employment.

121.    Plaintiff's wrongful termination was a direct, proximate and pretextual result of race discrimination.

122.    As a result of Defendants' conduct as alleged in this Complaint, Plaintiff suffered and continues to suffer, monetary damages and non-monetary damages, including but not limited to, the loss of income, lost benefits, other financial loss, as well as emotional distress, reputational damages, humiliation, physical distress, and mental anguish; and such other legal and equitable relief as just and proper.

123.    Defendants' unlawful termination of Plaintiff's employment constitutes a willful and wanton violation of Plaintiff's rights as protected under Section 1981 and was done with reckless indifference to those rights, entitling Plaintiff to an award of punitive damages.

## COUNT 7:  VIOLATION OF 42 U.S.C. § 1981

## HOSTILE WORK ENVIRONMENT AND HARASSMENT
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

124.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

125.   In violation of Section 1981, Defendants Burck, Corey, and Shaffer intentionally discriminated against Plaintiff on the basis of her race by subjecting Plaintiff to a racially hostile work environment and harassment that was severe or pervasive enough to alter the terms and conditions of her employment, including, but not limited to, frequent verbal abuse, increasingly aggressive confrontations, initiating and perpetuating malicious gossip and mockery of Plaintiff, subjecting Plaintiff to heightened scrutiny and surveillance, and enlisting other employees and agents to subject Plaintiff to harassment and surveillance.

126.   Defendant's unlawful conduct toward Plaintiff was unwelcome and created an environment so hostile that a reasonable person would find it abusive.

127.   Defendants' misconduct was intended to infringe on Plaintiff's civil rights as protected under Section 1981 and therefore subjects them to individual liability. Defendants' harassment of Plaintiff resulted in various adverse employment actions, including, but not limited to, interference with Plaintiff's work performance, undesirable reassignments and significant reductions in her responsibilities, the suppression of Plaintiff's billable hours, and Plaintiff's wrongful termination.

128.   As a direct and proximate cause of Defendants' actions, Plaintiff suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion, promotional opportunities, mental anguish, humiliation, expenses and costs.

129.   As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages, damages for emotional distress, punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

## COUNT 8:   VIOLATION OF 42 U.S.C. § 1981
### RETALIATION
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

130.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

131.   In violation of Section 1981, Defendants Burck, Corey, and Shaffer intentionally and relentlessly retaliated against Plaintiff for her protected opposition to and complaints of unlawful discrimination and retaliation.

132.   Defendants' unlawful retaliation includes, but is not limited to, deciding in July 2015 to deny partnership or promotion consideration to Plaintiff without cause and in contravention of the law firm's policies, deciding in August 2015 to wrongfully terminate Plaintiff's employment without justification, and making extensive post hoc efforts to find or otherwise manufacture a justification for Defendants' July and August 2015 decisions by subjecting Plaintiff to heightened and unprecedented scrutiny, along with affirmative acts intended to suppress Plaintiff's billable hours.

133.   In addition, Defendants also retaliated against Plaintiff and her close family members includes, but is not limited to, Quinn Emanuel's retaliatory cancellation of its representation agreement with Plaintiff's father-in-law, Mr. Nwaneri, Senior in July 2016 (based on falsely inflated bills and a few days after Plaintiff's June 30, 2016 complaint regarding misconduct by Defendants and others), Quinn Emanuel's retaliatory arbitration lawsuit in March

2017 (which Defendants initiated 3 days after Defendants' receipt of Plaintiff's February 27, 2017 employment discrimination charge) against Mr. Nwaneri, Senior, and Defendants' use of the arbitration lawsuit to intimidate, extort, and humiliate Plaintiff and Mr. Nwaneri, Senior.

134.   Defendants' unlawful retaliatory conduct is likely to dissuade an employee from engaging in protected activity.

135.   Defendants' misconduct was intended to infringe on Plaintiff's civil rights as protected under Section 1981 and therefore subjects them to individual liability. Defendants' harassment of Plaintiff resulted in various adverse employment actions, including, but not limited to, interference with Plaintiff's work performance, undesirable reassignments and significant reductions in her responsibilities, the suppression of Plaintiff's billable hours, and Plaintiff's wrongful termination.

136.   As a direct and proximate result of Defendants' violations of Section 1981, Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits.

137.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

138.   Defendants' unlawful retaliatory acts constitute willful and wanton violations of Section 1981, and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**COUNT 9:  VIOLATION OF 42 U.S.C. § 1985(3) ("Section 1985(3)")**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS:  SEX DISCRIMINATION**
(AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)

139.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

140.    In violation of Section 1985(3), Defendants Quinn Emanuel, Burck, Corey, and Shaffer conspired, directly or indirectly, for the purpose of depriving Plaintiff of her right to Equal Protection of the law and to be free from intentional discrimination and retaliation on the basis of her sex.

141.    Defendants reached an agreement to wrongfully terminate Plaintiff's employment and deny her any opportunity for promotion without cause, to manufacture reasons post hoc to retroactively justify their earlier adverse employment decisions.

142.    In so doing, Defendants took actions in furtherance of this conspiracy, including intentionally suppressing Plaintiff's billable hours and subjecting Plaintiff to heightened scrutiny, and other wrongful conduct, causing injury to Plaintiff.

143.    Defendants' misconduct was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

144.    As a direct and proximate result of Defendants' violations of Section 1985(3), Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits.

145.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1985(3), Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

146.   Defendants' unlawful acts constitute willful and wanton violations of Section 1985(3), and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### COUNT 10:  VIOLATION OF 42 U.S.C. § 1985(3)
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS:  RACE DISCRIMINATION
(AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)

147.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

148.   In violation of Section 1985(3), Defendants Quinn Emanuel, Burck, Corey, and Shaffer conspired, directly or indirectly, for the purpose of depriving Plaintiff of her right to Equal Protection of the law and to be free from intentional discrimination and retaliation on the basis of her race.

149.   Defendants reached an agreement to wrongfully terminate Plaintiff's employment and deny her any opportunity for promotion without cause, to manufacture reasons post hoc to retroactively justify their earlier adverse employment decisions.

150.   In so doing, Defendants took actions in furtherance of this conspiracy, including intentionally suppressing Plaintiff's billable hours and subjecting Plaintiff to heightened scrutiny, and other wrongful conduct, causing injury to Plaintiff.

151.   Defendants' misconduct was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

44

152.    As a direct and proximate result of Defendants' violations of Section 1985(3), Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits.

153.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1985(3), Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

154.    Defendants' unlawful retaliatory acts constitute willful and wanton violations of Section 1985(3), and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## COUNT 11:  VIOLATION OF 42 U.S.C. § 1985(3)
### CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS:  RETALIATION
(AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)

155.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

156.    In violation of Section 1985(3), Defendants Quinn Emanuel, Burck, Corey, and Shaffer conspired, directly or indirectly, and with others, including the arbitration company JAMS, for the purpose of depriving Plaintiff of her right to Equal Protection of the law and to be free from unlawful retaliation for opposing intentional and invidious employment discrimination.

157.    Among other things, Defendants agreed to retaliate against Plaintiff for engaging in protected activities opposing Defendants' discriminatory conduct by denying Plaintiff

promotional consideration, wrongfully terminating Plaintiff's employment without cause, and then manufacturing reasons to retroactively justify their earlier decisions. Defendants acted in furtherance of the conspiracy in several ways, including, but not limited to, intentionally suppressing Plaintiff's billable hours subjecting Plaintiff to targeted and heightened scrutiny, and disparaging Plaintiff to others, and subjecting to harassment and other wrongful conduct in Defendants' frivolous and retaliatory arbitration lawsuit against Mr. Nwaneri, Senior.

158.  As a result of Defendants' conspiracy, Plaintiff was wrongfully denied consideration for promotion, unlawfully terminated without justification, and deprived of Equal Protection of the law.

159.  As a direct and proximate result of Defendants' violations of Section 1985(3), Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits.

160.  As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1985(3), Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

161.  Defendants' unlawful retaliatory acts constitute willful and wanton violations of Section 1985(3), and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

162.  Defendants' unlawful retaliatory acts constitute willful and wanton violations of Section 1985(3), and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**COUNT 12:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS
ACT, D.C. Code §§ 2-1401, et seq.
HOSTILE WORK ENVIRONMENT & HARASSMENT
(AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)**

163.    Plaintiff realleges and incorporates each and every allegation of this Complaint.

164.    Defendants Quinn Emanuel, Burck, Shaffer, and Corey, are all "employers" within
the meaning of the DCHRA, and unlawfully discriminated against Plaintiff by creating a hostile
work environment in which Plaintiff was the subject of extensive harassment at the hands of her
colleagues and supervisors, including Burck and Shaffer.  A reasonable person would find their
conduct and the resulting environment to be abusive, and Defendants' harassment substantially
affected the terms and conditions of Plaintiff's employment, including adverse actions such as
undesirable reassignments, significant reductions in her responsibilities, the suppression of her
billable hours, and Plaintiff's wrongful termination, in violation of the DCHRA.

165.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless,
and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

166.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered
and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other
severe financial losses, as well as humiliation, embarrassment, emotional and physical distress,
and mental anguish.

167.    Due to Defendants' discrimination, Plaintiff is entitled to all legal and equitable
remedies available for violations of the DCHRA, including an award of punitive damages.

**COUNT 13:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS
ACT, D.C. Code §§ 2-1401, et seq.**

**RETALIATION**
(AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)

168. Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

169. Defendants Quinn Emanuel, Burck, Shaffer, and Corey, are all "employers" within the meaning of the DCHRA, and unlawfully discriminated against Plaintiff by retaliating against her for opposing race and gender discrimination, in violation of the DCHRA.

170. Defendants' unlawful retaliation includes, but is not limited to, deciding in July 2015 to deny partnership or promotion consideration to Plaintiff without cause and in contravention of the law firm's policies, deciding in August 2015 to wrongfully terminate Plaintiff's employment without justification, and making extensive post hoc efforts to find or otherwise manufacture a justification for Defendants' July and August 2015 decisions by subjecting Plaintiff to heightened and unprecedented scrutiny, along with affirmative acts intended to suppress Plaintiff's billable hours.

171. In addition, Defendants also retaliated against Plaintiff and her close family members includes, but is not limited to, Quinn Emanuel's retaliatory cancellation of its representation agreement with Plaintiff's father-in-law, Mr. Nwaneri, Senior in July 2016 (based on falsely inflated bills and a few days after Plaintiff's June 30, 2016 complaint regarding misconduct by Defendants and others), Quinn Emanuel's retaliatory arbitration lawsuit in March 2017 (which Defendants initiated 3 days after Defendants' receipt of Plaintiff's February 27, 2017 employment discrimination charge) against Mr. Nwaneri, Senior, and Defendants' use of the arbitration lawsuit to intimidate, extort, and humiliate Plaintiff and Mr. Nwaneri, Senior.

172. Defendants' unlawful retaliatory conduct is likely to dissuade an employee from engaging in protected activity.

173.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights Plaintiff, entitling her to punitive damages.

174.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

175.   Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 14:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### RACE DISCRIMINATION
(AGAINST DEFENDANT QUINN EMANUEL)

176.   Plaintiff realleges and incorporates each and every allegation of this Complaint.

177.   Defendant Quinn Emanuel, an employer within the meaning of the DCHRA, wrongfully discriminated against Plaintiff by treating her differently from, and less preferably than, similarly situated white employees.  Defendants' disparate treatment resulted in several adverse employment actions that materially affected Plaintiff's employment in violation of the DCHRA, including the loss of promotional opportunities, wrongful termination, and less compensation.

178.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

179.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

180.    Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

**COUNT 15:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.**
**GENDER DISCRIMINATION**
(AGAINST DEFENDANT QUINN EMANUEL)

181.    Plaintiff realleges and incorporates each and every allegation of this Complaint.

182.    Defendant Quinn Emanuel, an employer within the meaning of the DCHRA, has discriminated against Plaintiff by treating her differently from, and less preferably than, similarly situated males by subjecting her to disparate treatment, including loss of promotional opportunities, wrongful termination, and pay discrimination in violation of the DCHRA.

183.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

184.    As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

185.    Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

**COUNT 16:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.**
**PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION**
(AGAINST DEFENDANT QUINN EMANUEL)

186.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

187.    Defendant Quinn Emanuel has discriminated against Plaintiff on the basis of her gender, including pregnancy and maternity.   Defendant has subjected Plaintiff to disparate treatment on the basis of her pregnancy, return from maternity leave, and status as a new mother with respect to Defendant's policies, compensation, practices, and procedures.   In addition, Defendant subjected Plaintiff to substandard terms and conditions of employment such as discriminatory denials of promotional opportunities and discriminatory treatment with respect to leave and work responsibilities in violation of the DCHRA.

188.    As a result of Quinn Emanuel's conduct alleged in this Complaint, Plaintiff has suffered and continue to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

189.    As a result of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 17: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### FAMILY RESPONSIBILITIES DISCRIMINATION
(AGAINST DEFENDANT QUINN EMANUEL)

190.    Plaintiff realleges and incorporates each and every allegation of this Complaint.

191.    Defendant Quinn Emanuel, an employer within the meaning of the DCHRA, subjected Plaintiff to disparate treatment on the basis of her family responsibilities and status as a new mother with respect to Defendant's policies, compensation, and practices, and procedures.   In addition, Defendant subjected Plaintiff to substandard terms and conditions of employment such

as discriminatory treatment with respect to leave and work responsibilities in violation of the DCHRA.

192.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

193.   As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

194.   Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

**COUNT 18: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,**
**D.C. Code §§ 2-1401, et seq.**
**WRONGFUL TERMINATION**
(AGAINST DEFENDANT QUINN EMANUEL)

195.   Plaintiff realleges and incorporates each and every allegation of this Complaint.

196.   Defendant Quinn Emanuel, an employer within the meaning of the DCHRA, wrongfully terminated Plaintiff's employment due to discrimination based on her race, gender, family responsibilities (including her return from maternity leave in 2015), and in retaliation for her discrimination complaints.   Plaintiff's wrongful termination was an adverse employment action that materially and adversely affected Plaintiff's employment in violation of the DCHRA.

197.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

198.    As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

199.    Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 19: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### RACE DISCRIMINATION AND/OR SUBTERFUGE
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

200.    Plaintiff realleges and incorporates each and every allegation of this Complaint.

201.    Defendants Burck, Corey, and Shaffer are "employers" within the meaning of the DCHRA and individually liable for wrongfully discriminating against Plaintiff by treating her differently from, and less preferably than, similarly situated white employees.   Defendants' disparate treatment resulted in several adverse employment actions that materially affected Plaintiff's employment in violation of the DCHRA, including the suppression of Plaintiff's billable hours, loss of promotional opportunities, wrongful termination, and less compensation.

202.    Defendants also unlawfully discriminated against Plaintiff by deciding in July and August 2015 to deny Plaintiff consideration for partnership and to terminate her employment without cause, withhold that information until May 2016 (while misleading Plaintiff about her status at the firm and making efforts to retroactively justify their decisions by suppressing her billable hours and subjecting her to heightened scrutiny), and manufacture a post hoc rationale for their adverse and discriminatory employment decisions.

203.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

204.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

205.    Due to Defendants' discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

**COUNT 20: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT,**
**D.C. Code §§ 2-1401, et seq.**
**GENDER DISCRIMINATION AND/OR SUBTERFUGE**
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

206.    Plaintiff realleges and incorporates each and every allegation of this Complaint.

207.    Defendants Burck, Corey, and Shaffer are "employers" within the meaning of the DCHRA and individually liable for wrongfully discriminating against Plaintiff by treating her differently from, and less preferably than, similarly situated male employees. Defendants' disparate treatment resulted in several adverse employment actions that materially affected Plaintiff's employment in violation of the DCHRA, including the suppression of Plaintiff's billable hours, loss of promotional opportunities, wrongful termination, and less compensation.

208.    Defendants also unlawfully discriminated against Plaintiff by deciding in July and August 2015 to deny Plaintiff consideration for partnership and to terminate her employment without cause, withhold that information until May 2016 (while misleading Plaintiff about her status at the firm and making efforts to retroactively justify their decisions by suppressing her

billable hours and subjecting her to heightened scrutiny), and manufacture a post hoc rationale for their adverse and discriminatory employment decisions.

209.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

210.   As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

211.   Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 21:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### PREGNANCY AND MATERNITY (SEX PLUS) DISCRIMINATION AND/OR SUBTERFUGE
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

212.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

213.   Defendant Quinn Emanuel has discriminated against Plaintiff

214.   Defendants Burck, Corey, and Shaffer are "employers" within the meaning of the DCHRA and individually liable for wrongfully discriminating against Plaintiff on the basis of her gender, including pregnancy and maternity.  Defendant subjected Plaintiff to disparate treatment on the basis of her pregnancy, return from maternity leave, and status as a new mother with respect to Defendant's policies, compensation, and practices, and procedures.  In addition, Defendant subjected Plaintiff to substandard terms and conditions of employment such as discriminatory

denials of promotional opportunities, discriminatory treatment with respect to leave and work responsibilities in violation of the DCHRA.

215.   Defendants also unlawfully discriminated against Plaintiff by deciding in July and August 2015 to deny Plaintiff consideration for partnership and to terminate her employment without cause, withhold that information until May 2016 (while misleading Plaintiff about her status at the firm and making efforts to retroactively justify their decisions by suppressing her billable hours and subjecting her to heightened scrutiny), and manufacture a post hoc rationale for their adverse and discriminatory employment decisions.

216.   As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

217.   As a result of Defendants' discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 22: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### FAMILY RESPONSIBILITIES DISCRIMINATION AND/OR SUBTERFUGE
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

218.   Plaintiff realleges and incorporates each and every allegation of this Complaint.

219.   Defendants Burck, Corey, and Shaffer are "employers" within the meaning of the DCHRA and individually liable for wrongfully discriminating against Plaintiff on the basis of her gender, including pregnancy and maternity. Defendant subjected Plaintiff to disparate treatment on the basis of her family responsibilities and status as a new mother by subjecting Plaintiff to

substandard terms and conditions of employment such as punitive changes in case schedules to conflict with Plaintiff's family responsibilities and discriminatory treatment with respect to leave and work responsibilities in violation of the DCHRA.

220.    Defendants also unlawfully discriminated against Plaintiff by deciding in July and August 2015 to deny Plaintiff consideration for partnership and to terminate her employment without cause, withhold that information until May 2016 (while misleading Plaintiff about her status at the firm and making efforts to retroactively justify their decisions by suppressing her billable hours and subjecting her to heightened scrutiny), and manufacture a post hoc rationale for their adverse and discriminatory employment decisions.

221.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

222.    As a result of Defendants' discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 23: VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### WRONGFUL TERMINATION AND/OR SUBTERFUGE
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

223.    Defendants Burck, Corey, and Shaffer are "employers" within the meaning of the DCHRA, wrongfully terminated Plaintiff's employment due to discrimination based on her race, gender, family responsibilities (including her return from maternity leave in 2015), and in retaliation for her complaints of discriminatory treatment. Plaintiff's wrongful termination was an

adverse employment action that materially and adversely affected Plaintiff's employment in violation of the DCHRA.

224.    Defendants also unlawfully discriminated against Plaintiff by deciding in July and August 2015 to deny Plaintiff consideration for partnership and to terminate her employment without cause, withhold that information until May 2016 (while misleading Plaintiff about her status at the firm and making efforts to retroactively justify their decisions by suppressing her billable hours and subjecting her to heightened scrutiny), and manufacture a post hoc rationale for their adverse and discriminatory employment decisions.

225.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling her to punitive damages.

226.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including, but not limited to, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

227.    Due to Defendants' discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.


### COUNT 24:  VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. Code §§ 2-1401, et seq.
### AIDING AND ABETTING
(AGAINST INDIVIDUAL DEFENDANTS BURCK, COREY, AND SHAFFER)

228.    Plaintiff alleges and incorporates each and every allegation of this Complaint.

229.    Upon information and belief, Defendants Burck, Corey, and Shaffer all  actively and knowingly participated in practices that resulted in discrimination, retaliation, and wrongful

termination based on Plaintiff's race, gender, and family responsibilities in violation of the DCHRA.

230.    By aiding, abetting, inviting, compelling and/or coercing Defendant Quinn Emanuel in its discriminatory practices and decisions, each Individual Defendant has aided and abetted both Defendant Quinn Emanuel and each of the other individual defendant's discrimination against Plaintiff, in violation of D.C. Code § 2-1402.62.

231.    Defendants' conduct has been intentional, deliberate, willful, reckless, and conducted in callous disregard of Plaintiff's rights.

232.    By reason of Defendants' aiding and abetting discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCHRA, including an award of punitive damages.

## COUNT 25: VIOLATION OF THE FAMILY MEDICAL LEAVE ACT, 29 U.S.C. § 2601 et seq.
## DISCRIMINATION, INTERFERENCE, AND RETALIATION
### (AGAINST DEFENDANT QUINN EMANUEL)

233.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

234.    .Under the FMLA, an employee must be restored by the employer to the same position held by the employee when the leave commenced, or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. The FMLA also precludes an employer from treating the use of FMLA leave as a "negative factor" in employment actions such as hiring, promotions, or disciplinary actions.

235.    Quinn Emanuel retaliated against Plaintiff for taking FMLA leaves in 2014 in various ways upon her return to the firm in 2015, including but not limited to, diminishing her role

on billable matters, and refusing to assign her to any suitable or significant litigation matters upon her return from FMLA leave, and ultimately denied Plaintiff consistent billable work, which further decreaed Plaintiff's billable hours. Defendant further limited Plaintiff's opportunities to amass meaningful experience and/or develop a portfolio for partnership candidacy by refusing to consider Plaintiff for promotion and instead deciding to terminate Plaintiff despite her positive performance review and deferral of partnership consideration.

236.    Defendant acted willfully, intentionally, and with reckless disregard for Plaintiff's rights under the FMLA. .As a direct and proximate result of Defendant's actions, Plaitniff suffered injury and monetary damages, including,but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs..

237.    Due to Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the FMLA, including an award of liquidated damages for all willful violations, pursuant to 29 U.S.C. § 2617.

## COUNT 26:  VIOLATION OF THE DISTRICT OF COLUMBIA FAMILY AND MEDICAL LEAVE ACT, D.C. CODE §32-501 et seq. DISCRIMINATION, INTERFERENCE AND RETALIATION

238.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

239.    Quinn Emanuel interefered with Plaintiff's taking of protected maternity leave and retaliated agaisnt her upon her return for the taking of such leave, in violation of the DCFMLA. Quinn Emanuel discriminated agaisnt and retaliated agaisnt Plaintiff for her taking DCFMLA leave by treating it as a negative factor in employment actiions, such as failing to promote Plaintiff,

denying her carareer-advancemet and other development opportunities, and creating an environment hostile to individuals who have taken the statutorily protective maternity leave.

240. Quinn Emanuel retaliated against Plaintiff for taking DCFMLA leaves in 2013 and 2014 in various ways upon her return to the firm in 2015, including but not limited to, diminishing her role on billable matters, and refusing to assign her to any suitable or significant litigation matters upon her return from DCFMLA leave, and ultimately denied Plaintiff consistent billable work, which further decreaed Plaintiff's billable hours. Defendant further limited Plaintiff's opportunities to amass meaningful experience and/or develop a portfolio for partnership candidacy by refusing to consider Plaintiff for promotion and instead deciding to terminate Plaintiff despite her positive performance review and deferral of partnership consideration.

241. Defendant acted willfully, intentionally, and with reckless disregard for Plaintiff's rights under the FMLA. As a direct and proximate result of Defendant's actions, Plaitniff suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion and promotional opportunities, expenses, and costs.

242. Due to Defendant's discrimination, interference, and retaliation, Plaintiff is entitled to all legal and equitable remedies available for violations of the DCFMLA, including an award of compensatory damangs, consequential damages, and prejudgment interest.

## COUNT 27:  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§ 2000e, et seq., AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT OF 1978
## PREGNANCY AND MATERNITY (SEX PLUS)
### (AGAINST DEFENDANT QUINN EMANUEL)

243. Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

244.    Defendant discriminated against Plaintiff by subjecting her to discriminatory pay in violation of the Equal Pay Act. The differential in pay between male and female attorneys was not due to a legitimate seniority system, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

245.    Defendant Quinn Emanuel attempted to cause, or contributed to the continuation of pay discrimination based on gender, in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a) and requires the application of the three-year limitations period for these violations, pursuant to 29 U.S.C. § 255.

246.    As a result of Defendant's conduct as alleged in this Complaint, Plaintiff has suffered harm, including, but not limited to, lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

247.    As a result of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages, interest, and other compensation pursuant to 29 U.S.C. § 216(b).

## COUNT 28:  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §2000e-2(a), et seq.
### WRONGFUL TERMINATION
(AGAINST DEFENDANT QUINN EMANUEL)

248.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

249.    Defendant Quinn Emanuel terminated Plaintiff's employment due to race, gender, and pregnancy discrimination. Defendant's discharge of Plaintiff was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

250.    Defendant's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff, entitling her to punitive damages.

251.    As a result of Defendant's discharge, Plaintiff suffered harm, including, without limitation, lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress.

252.    Plaintiff is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

## COUNT 29: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §2000e-2(a), et seq.
### RETALIATION
### (AGAINST DEFENDANT QUINN EMANUEL)

253.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

254.    In violation of Title VII, Defendant Quinn Emanuel retaliated against Plaintiff for engaging in the protected activity of opposing and reporting incidents of race discrimination.

255.    Defendant's retaliatory and discriminatory acts against Plaintiff included, but were not limited to, denying promotional opportunities to Plaintiff, increased scrutiny, and wrongful termination.

256.    Additionally, Defendant retaliated against Plaintiff and her close family members by subjecting them to several adverse actions, including, but not limited to, cancelling Quinn Emanuel's representation agreement with Plaintiff's father-in-law, Mr. Nwaneri, Senior, under the pretense of unpaid legal bills and refusing to correct or accept any payment toward the corrected bills; filing a retaliatory arbitration lawsuit against Plaintiff's father-in-law for a nominal amount of money immediately after Plaintiff filed her February 2017 discrimination charge alleging

Defendant's violation of Title VII and other anti-discrimination laws, and Defendant's abuse of its arbitration lawsuit to harass, extort, humiliate, and intimidate Plaintiff and Mr. Nwaneri, Senior.

257.    Defendant's unlawful retaliatory acts are likely to dissuade an employee from engaging in protected activity.

258.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

259.    As a direct and proximate result of Defendant's unlawful retaliation in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

260.    Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous, malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

261.    Plaintiff is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

## COUNT 30:  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. §2000e-2(a), et seq.
### HOSTILE WORK ENVIRONMENT & HARASSMENT
#### (AGAINST DEFENDANT QUINN EMANUEL)

262.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

263.    In violation of Title VII, Defendant intentionally discriminated against Plaintiff on the basis of her race and gender by subjecting Plaintiff to a hostile work environment and harassment that was severe or pervasive enough to alter the terms and conditions of her employment.

264.    Defendant Quinn Emanuel is strictly liable for this violation because, as alleged in this Complaint: Defendant had actual and constructive knowledge of the extensive supervisory harassment and hostility Plaintiff was subjected to by her supervisors, including Burck and Shaffer; a reasonable person would find their conduct and the resulting environment to be hostile and abusive; and Defendants' harassment resulted in several adverse employment actions against Plaintiff, including undesirable reassignments, significant reductions in her responsibilities, the suppression of her billable hours, and culminated in Plaintiff's termination.

265.    As a direct and proximate cause of Quinn Emanuel's actions, Plaintiff suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion, promotional opportunities, mental anguish, humiliation, expenses and costs.

266.    As a result of Defendant's unlawful conduct, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages, damages for emotional distress, punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

267.    Defendant's discharge of Plaintiff was an adverse employment action that materially and adversely changed the overall terms and conditions of her employment in violation of Title VII.

268.    Defendant's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to the rights of Plaintiff, entitling her to punitive damages.

269.     As a result of Defendant's discharge, Plaintiff suffered harm, including, without limitation, lost earnings, lost benefits, and other   severe financial losses, as well as humiliation, embarrassment, emotional and physical distress.

270.     Plaintiff is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

## COUNT 31: TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP
### (AGAINST DEFENDANTS BURCK, COREY, AND SHAFFER)

271.     Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

272.     In violation of D.C. tort law, Defendants improperly interfered with Plaintiff's continued employment relationship with Quinn Emanuel, by, among other things, using fraudulent methods to suppress Plaintiff's billable hours and prevent Plaintiff from obtaining other billable work, sabotaging Plaintiff's billable work assignments and business development proposals, and knowingly making false and defamatory statements about Plaintiff to dissuade other partners from working with her.

273.     Defendants' interference also included the harassing and discriminatory conduct alleged in this Complaint, including, but not limited to, heightened scrutiny of Plaintiff's work, verbal abused, and more frequent and harsh criticism of Plaintiff.

274.     Defendants' improper interference caused Plaintiff's billable hours to fall drastically, prevented Plaintiff from acquiring or continuing work with other partners at the law firm, and ultimately resulted in Defendant's wrongful termination of Plaintiff.

275.   As a direct and proximate cause of Defendants' tortious interference, Plaintiff suffered injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion, promotional opportunities, mental anguish, humiliation, expenses and costs.

276.   As a result of Defendants' tortious interference, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages, damages for emotional distress, punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

## COUNT 32: WRONGFUL DISCHARGE AGAINST PUBLIC POLICY
### (AGAINST DEFENDANTS BURCK, COREY, AND SHAFFER)

277.   Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

278.   In violation of public policy, Defendants wrongfully terminated Plaintiff through tortious interference with Plaintiff's employment relationships, defamation, discrimination and retaliation unlawful under various statutes, and other improper and/or malicious conduct.

279.   Defendants' wrongful termination of Plaintiff violated public policy and has caused Plaintiff to suffer injury and monetary damages, including, but not limited to, past and future loss of income, benefits, promotion, promotional opportunities, mental anguish, humiliation, expenses and costs.

280.   As a result of Defendant's tortious interference, Plaintiff is entitled to compensatory damages, including, but not limited to, lost wages, damages for emotional distress, punitive damages; pre- and post-judgment interest; attorneys' fees and costs; and such other legal and equitable relief as just and proper.

## COUNT 33: UNJUST ENRICHMENT / QUANTUM MERUIT
### (AGAINST DEFENDANT QUINN EMANUEL)

281.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

282.    Plaintiff provided legal services for Defendant for several years and earned at least 4 weeks' of vacation time by the time of her departure from the law firm in 2016. Defendant is aware of Plaintiff's vacation accrual and the law firm's standard practice of compensating employees for such accruals upon departure. Despite that, Defendant has refused to compensate Plaintiff for any accrued vacation time in 2016.

283.    As a result, Defendant has been unjustly enriched by withholding pay for vacation time Plaintiff earned and accrued in 2016.

284.    Plaintiff is therefore entitled to all equitable remedies and other relief the court deems proper.

## COUNT 34:  CIVIL CONSPIRACY
### (AGAINST DEFENDANTS QUINN EMANUEL, BURCK, SHAFFER, AND COREY)

285.    Plaintiff realleges and incorporates each and every allegation in this Complaint and discrimination charge.

286.    Defendants Quinn Emanuel, Burck, Corey, and Shaffer conspired, directly or indirectly, for the purpose of wrongfully terminating Plaintiff's employment and deny her any opportunity for promotion without cause, and to manufacture reasons post hoc to retroactively justify their earlier adverse employment decisions.

287.    In so doing, Defendants took actions in furtherance of this conspiracy, including intentionally suppressing Plaintiff's billable hours and subjecting Plaintiff to heightened scrutiny, and other wrongful conduct, causing injury to Plaintiff.

288. Defendants' misconduct was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

289. As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits, as well severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

290. Defendants' unlawful acts constitute willful and wanton violations of Section 1985(3), and were outrageous, malicious, intended to injure Plaintiff, and done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## VI.   **JURY DEMAND**

1. Plaintiff requests a jury in this matter on all counts triable by jury.


September 17, 2020                                    Respectfully submitted,


                                        By:   _____

                                               Plaintiff Pro Se

CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of September 2020, I mailed the foregoing Amended
Complaint to Defendant Quinn Emanuel Urquhart & Sullivan, LLP at:

Richard C. Smith
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street NW, Floor 9
Washington, DC 20005

Respectfully submitted,

By: _____

Plaintiff Pro Se