FIRST FORTY-FIVE PAGES ONLY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CRYSTAL B. NWANERI,

*Plaintiff pro se,*

v.

QUINN EMANUEL URQUHART &
SULLIVAN LLP,
WILLIAM BURCK,
DEREK SHAFFER, and
JON COREY,

*Defendants.*

Civ. No. 1:19-cv-01540-TNM
(Oral Argument Requested)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## INTRODUCTION

The motion to dismiss filed by Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"), William Burck, Derek Shaffer, and Jon Corey ("Defendants") is heavy on vitriol but light on the law. The Amended Complaint laid bare Defendants' culture of misogyny and racism, and in response Defendants took their usual approach to reports of discrimination: swift, harsh retaliation. Defendants rushed to throw together a 57-page motion that spends more pages falsely maligning Plaintiff and misrepresenting matters outside the pleadings than discussing the applicable law with respect to the allegations of the Amended Complaint.

Of the analysis Defendants did include, most is clearly erroneous. Defendants repeatedly apply the wrong legal standards and misstate fundamental aspects of the law. For example, Defendants rely on a standard of harm for retaliation claims ("adverse action") that has been superseded by Supreme Court precedent, *see Burlington N. & S.F.R. Co. v. White,* 548 U.S. 53 (2006), and has resulted in innumerable reversals by Courts of Appeal due to the same misapplication of the law. Defendants likewise argue that third parties and former employees are not entitled to protection from retaliation and that conduct post-employment is not actionable, but those are exactly the arguments rejected by the Supreme Court in *Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997). Defendants' misapprehension of these issues is so profound that they contend an employer's inadmissible proffer of a purportedly nondiscriminatory reason ends the analysis and justifies dismissal, ignoring the longstanding burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), this Circuit's binding precedent, and the Federal Rules of Civil Procedure.

Defendants' disregard for the law is only surpassed by their shameless entitlement. They casually demand that the Court make findings that are patently unconstitutional, such as applying

1

issue preclusion to Plaintiff even though she was neither party nor privy to any prior litigation.  Well aware that Due Process prohibits the exercise of collateral estoppel against nonparties (who have not had their day in court), Defendants declare – without any legal authority – that "as a matter of law" nonmutual issue preclusion forecloses Plaintiff's claims.   And while egregiously misrepresenting the facts and law throughout their frivolous motion to dismiss, Defendants threaten Plaintiff with Rule 11 sanctions, for no reason other than to silence and intimidate.[1]

Defendants' motion to dismiss does not warrant dismissal of the Amended Complaint; it warrants sanctions for their baseless and frivolous arguments, bad faith misrepresentations, and intentional flouting of the Rules of Civil Procedure, the Local Rules, and this Court's Standing Order.  Defendants' motion is improper in form and substance, and wastes the resources of the Court and intentionally strains the limited resources of Plaintiff.   At a minimum, Defendants' motion should be denied because it fails to satisfy Rule 12(b)(6)'s stringent standard for dismissal.

## STANDARD OF REVIEW

For purposes of a Rule 12(b)(6) motion to dismiss, the complaint's factual allegations— including mixed questions of law and fact—must be taken as true and all reasonable inferences made in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).  It "must contain

---

[1] Plaintiff made every allegation in the Amended Complaint in truth and good faith. *See generally* Dkt. 27.  Defendants' threat of sanctions is strongly worded, but hollow; they cannot identify— much less move for sanctions on—a single claim, argument, or allegation that Plaintiff has made in bad faith.  Refraining from executing a baseless, unwarranted threat is not consideration for the resources of the Court or Plaintiff.  If Defendants had any such regard, they would not have filed a motion filled to the brim with legal error and misapplied standards.  Should Defendants have any good faith basis for the Rule 11 sanctions they claim "would be well warranted"—but fail to identify—they are free to raise it and welcome to identify it, which costs nothing.  Otherwise, Defendants should stop posturing. *See* Defs.' Mem. at 2 n.1.

sufficient factual matter," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but "does not need detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 557 (2007) (citation omitted). Nor is it necessary for a plaintiff to "plead all elements of his prima facie case" at this pre-discovery stage. *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 129-130 (D.D.C. 2009) (citing Fed. R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Pro se litigants are entitled to liberal construction of their pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Defendants claim that Plaintiff is not entitled to the protections afforded to pro se litigants because she is an attorney, but go to great lengths throughout their motion to degrade Plaintiff personally and professionally. *See, e.g.,* Defs.' Mem. at 1 (alleging acumen lower than "pro se litigants who lack legal training"); *id.* at 2 ("destitute" and "desperate"). This does not track. If a pro se litigant without legal training is better positioned to practice law, as Defendants claim, *see id.* at 1, then it would follow that Plaintiff is entitled to at least the same protections as, if not more than, a "typical pro se plaintiff." Defendants cannot have it both ways.

Defendants contend that Plaintiff's claims somehow prevent her from receiving *pro se* protections, which makes little sense in light of Plaintiff's allegations. It is apparent from a cursory review of the original and Amended Complaint that Plaintiff's claims are grounded in disparate treatment, *i.e.,* that Defendants' treated her differently than others based on Plaintiff's membership in a protected class, and disparate impact, *i.e.,* that Defendants subjected Plaintiff to facially neutral policies that disproportionately affected members of a protected class. *See* Compl. at ¶¶ 3, 16-19; Am. Compl. at ¶¶ 37-38. As Defendants are aware, their conduct forms the crux of Plaintiff's claims, not Plaintiff's competence. This argument is particularly disingenuous coming from Quinn Emanuel: they have been sued for discrimination lawsuits on a number of occasions and know the employer's conduct is always the focal point of any discrimination or retaliation claim.

Defendants are merely reframing the issues to justify their contrived and belated allegations that Plaintiff's work performance was deficient. To be sure, if Defendants' current assessment of Plaintiff's performance were in any way accurate, Defendants would have: (a) reflected these criticisms in Plaintiff's performance review, (b) provided Plaintiff's performance review in the associate review process, as per firm policy, and (c) informed Plaintiff of these issues during the meetings Plaintiff requested in May and June 2016. *See* Am. Compl. at ¶ __. But Defendants did none of the above. If Defendants' criticisms of Plaintiff's performance were in any way real or legitimate, certainly Defendants would have communicated this when informing Plaintiff of her termination in June 2016. They did not.

Defendants did not take any of these reasonable actions because these claims were not true and were not Defendants' reasons. Defendants are making this up as they go along, even during the course of this litigation. Like Pinocchio's nose, Defendants' version of Plaintiff's alleged performance problems gets longer with each telling. None of the facts changed between this motion and their first motion to dismiss, but Defendants' cooked up list of performance problems grew exponentially. *Compare* Dkt. __ to Dkt. __. The only intervening event was Plaintiff's filing of the Amended Complaint. Defendants' present filing, however, is a motion to dismiss under Rule 12(b)(6) limited to Plaintiff's pleadings. And the allegations Defendants make here are attorney hearsay, which counts for nothing.[2]

---

[2] This is especially true for Defendants' attorney, Richard Smith. Smith is a partner who joined Quinn Emanuel after Plaintiff left. Plaintiff does not know him and has never met him. During this case, however, Smith has lacked candor about even the smallest issues, *i.e.,* falsifying certificates of service dates, *see* Dkt. 13 (USPS records confirming Smith served documents several days later than stated in his filings), and misrepresenting his communications with Plaintiff, *id.* (Smith claimed teleconference was mandatory under Local Rule 16.3, even though Rule 16.3(b) specifically exempts this case because "no answer has been filed").

## THE FACTS UPON WHICH THE MOTION TO DIMISS MUST BE DECIDED[3]

Plaintiff, an African-American woman, was employed from 2012 until 2016 as an associate in the Washington, D.C. office of Quinn Emanuel. Am. Compl. at ¶ 27. Before joining Quinn Emanuel, Plaintiff graduated with distinction from Georgetown University Law Center and completed federal clerkships on the district and appellate court levels. *Id.* Although based in the D.C. office, Plaintiff worked mostly with partners in other offices from 2012 to 2014. *Id.*

Family circumstances necessitated Plaintiff taking unpaid leave pursuant to the Family Medical Leave Act ("FMLA") and its state analogue, the District of Columbia Family Medical Leave Act ("DCFMLA"), on two occasions: in 2013, to coordinate medical care for her terminally ill parent, and in 2014, after giving birth to her first child. *Id.* at ¶ 30. After returning from both leaves, Plaintiff received less compensation than similarly-situated male attorneys (bonus pay) and less developmental opportunities than similarly-situated white males. *Id.* at ¶ 30.

In early 2015, Plaintiff returned from maternity leave. Having spent most of her pregnancy working abroad the year before, Plaintiff sought out work from partners in the D.C. office to be close to home and her newborn, and to gain exposure to the D.C. partners. *Id.* at ¶ 31. Burck and Corey provided little assistance integrating Plaintiff into the D.C. office, but eventually staffed her on a matter in March 2015 with Derek Shaffer, a partner Burck often worked with. *Id.* at ¶ 36.

During the four months Shaffer worked with Plaintiff, he engaged in classic misogyny— he was extremely verbally abusive and aggressive towards Plaintiff, while treating her white colleagues in the opposite manner, giving them preferential assignments, more developmental opportunities, and subjecting their work to little to no scrutiny. Am. Compl. at ¶ 37. Conversely, Shaffer went out

---

[3] In light of the Court's order denying Plaintiff's request to file a motion in excess of 45-pages, Plaintiff provides a brief factual summary here, and additional facts as necessary in the Argument.

of his way to scrutinize and publicly criticize anything he could find in Plaintiff's work, to seek out confrontations with Plaintiff (*e.g.*, frequent abusive and degrading conduct, screaming tantrums, and other aggressions), Am. Compl., Ex. 1 at ¶. Shaffer's hostility was so palpable and out of place that even other employees noticed, including another partner on the case who expressed concerns about Shaffer's aggressions. *Id.* at ¶¶ 29-30.

Meanwhile, in April 2015, Plaintiff received an entirely positive "on track" performance review. *Id.* at There was no negative feedback or areas for improvement, and Plaintiff was complimented on her substantive work, client relations, and leadership. Am. Compl., Ex. 1 at ¶ 23. Also in April 2015, Plaintiff elected to defer partnership consideration, as allowed by firm policy, until the next review year (November 2016), which Quinn Emanuel approved. *Id.* at ¶ 6 n.1. Plaintiff also received other positive reviews at trial advocacy and in her business development work. *Id.* at ¶ 10.

But on the case with Shaffer, he continued to show preferential treatment to Plaintiff's white colleagues, and his aggressions became increasingly worse. Plaintiff raised these issues with two partners in April and May 2015. Am. Compl., at ¶ 38. Shortly after these meetings, Shaffer's conduct worsened. He became more verbally abusive, began insisting on projects he knew conflicted with Plaintiff's childcare and family obligations, intensifying his scrutinizing of Plaintiff's activities and attendance, demanding Plaintiff do significantly more work in less time with fewer resources, and going to even greater lengths to find problems in Plaintiff's work and publicly denigrate her in front of the case team. *Id.* at ¶¶ 38-42. The other partner on the case also observed Shaffer's increasingly hostile behavior and his targeted scrutiny of Plaintiff. Am. Compl., Ex. 1 at ¶ 30.

After Shaffer initiated a particularly explosive confrontation with Plaintiff, she sent Shaffer and Burck an email on July 7, 2015 describing her concerns regarding Shaffer's hostility and

disparate treatment of Plaintiff, which resulted in another of his explosions during a meeting he called later that day. Am. Compl., at ¶ 38.

Plaintiff also raised these issues with Corey, who was also the designated contact person for EEO/Harassment issues in the D.C. office. *Id.* Rather than address Plaintiff's concerns, Defendants began a campaign of retaliation and harassment against Plaintiff. *Id.* at ¶ 16.[4]

Defendants also engaged in other discriminatory, harassing, and tortious conduct, including: subjecting Plaintiff to an unprecedented level of scrutiny, interfering with her existing and prospective billable work, spreading false and misleading information about Plaintiff to dissuade other partners from working with her, and placing her on two "new" cases with Burck in August 2015 that were intentionally designed to fail. Both case teams were small, there was no role for Plaintiff, and Burck took various steps to undermine and demean Plaintiff to the other associates on the matter and to engender hostility towards Plaintiff by suggesting they "fight" with Plaintiff; one associate who was up for partner that year, Ben O'Neil, a white male, was happy to fight Plaintiff on Burck's behalf, became extraordinarily aggressive with Plaintiff, made racially insensitive comments on email, and surveilled Plaintiff on Burck's behalf.

Plaintiff made verbal and written complaints about the EEO/harassment issues to Corey several times, and the concerns about her drop in billable hours. Defendants did nothing to investigate, claimed there was no billable work, and persisted in their efforts to ensure Plaintiff's

---

[4] Defendants also planned in or around July 2015 (less than 4 months after Plaintiff's return from maternity leave and on her first case with Shaffer or Burck) to: (1) to deny Plaintiff any consideration for promotion to partner or of counsel (even though Quinn Emanuel had already approved Plaintiff's deferred partnership consideration until the next year, as allowed by the firm's policy and agreed to by her partner mentor), (2) to terminate Plaintiff's employment (even though her the April 2015 performance review was complimentary and "on track"), and (3) to withhold this information from Plaintiff until they had discovered or concocted a basis for their decision, to Plaintiff's detriment. Id. at ¶ 47.

billable hours dropped to nothing (including Burck telling other partners which whom Plaintiff was already working that the D.C. office planned to terminate Plaintiff; went to several partners specifically searching for "proof" to justify Defendants' earlier decision; and even in March 2016, demanded Plaintiff give him the names of partners she worked for while at the law firm, and then engaged in his own ad hoc review by contacting partners she had worked for dating back to 2012 (entirely the established performance review process).

When Plaintiff sent Corey a written email in April 2016 describing her concerns about harassment, EEO, and low hours issues, Defendants retaliated immediately by setting a meeting with Plaintiff and Corey to discuss her concerns. At the May 4, 2016 meeting, Corey ambushed Plaintiff by having Burck attend the meeting.   at which point they announced that Plaintiff would not receive partnership consideration (despite Quinn Emanuel agreeing to defer partnership consideration until November 2016) and that she should "move on" from the law firm.  Defendants provided no justification for the decision (aside from low hours) or articulated no specifics about what was meant by "move on".

Plaintiff followed up with Corey again in late May 2016 by email discussing additional concerns and harassment issues involving Burck and others.  Corey eventually agreed to meet with Plaintiff, but insisted she obtain a payment from her father-in-law, Ngozika Nwaneri, Sr., M.D., who was a client of Quinn Emanuel: the law firm was representing Mr. Nwaneri as plaintiff in a small property matter, and Corey was the engagement partner responsible for the case. Only after Plaintiff had provided the payment (of approximately $5,500) to Defendants would Corey meet with her.  When they did meet, Corey told her for the first time that Quinn Emanuel's decision was final and gave her an effective date (July 2, 2016, which was only 3 weeks away).

Plaintiff's employment counsel sent Quinn Emanuel another internal complaint on June 30, 2016 concerning Defendants' discriminatory and retaliatory conduct. *See* Ex. 1, June 30, 2016 Letter from Spiggle.   Am. Compl. at ¶ 15.   Twelve days later (and 1 month after requesting the $5,500 payment from Plaintiff before meeting with her on June 7), Defendants sent Mr. Nwaneri a notice of their intent to withdraw as counsel from his case.   *See* Ex. 2, July 12, 2016 Letter (from Corey). Defendants claimed that Mr. Nwaneri owed $30,000, but had not applied a 33% discount stated in his contract, resulting in a $10,000 overcharge.   Defendants refused to correct the $10,000 overcharge or to accept payment from Mr. Nwaneri. Am. Compl. at ¶ 17.   At the September 2016 hearing on the motion to withdraw, Defendants continued to make numerous misrepresentations to the court, including that the 33% discount had been applied to the bills and that bills were accurate. Even when Mr. Nwaneri offered at the hearing to pay, Defendants declined.

In February 2017, Plaintiff filed an EEOC Charge against Defendants (specifically naming Burck, Shaffer, and Corey).   Dkt. 27-1, Am. Compl., Ex.. 1 (discrimination charge marked as received by February 28, 2017).   Less than 3 days after receiving the charge, Quinn Emanuel began drafting its complaint against Plaintiff's father-in-law seeking $20,000—the amount of fees (minus the $10,000 overcharge) they had refused to correct or acknowledge in 2016 when insisting on withdrawing as counsel.   Defendants filed their retaliatory arbitration with JAMS on March 22, 2017, approximately 3 weeks after Quinn Emanuel received Plaintiff's discrimination charge (Defendants' billing records reflect they began drafting the arbitration complaint 3 days after receiving Plaintiff's EEOC charge).

Although Quinn Emanuel is a 700-lawyer law firm with gross annual revenues of approximately $2 Billion (and $1.6 Billion in 2016, according to AmLaw), Defendants' lawsuit against Plaintiff's father-in-law sought only $20,000, and Defendants deployed a team of

approximately 10 attorneys (who are Quinn Emanuel employees) to extract payment. Am. Compl. at ¶ 17. Throughout the arbitration lawsuit and related proceedings, Quinn Emanuel has also demanded close to $400,000 in additional costs and (fees to compensate itself at market rate and then some) for its efforts to collect the $20,000 fee Defendants refused to acknowledge or correct in 2016. Am. Compl. at ¶ 18.

Defendants also abused the arbitration lawsuit process to retaliate against Plaintiff directly, including unnecessary, frivolous demands for her to provide discovery and a third-party testimony on Defendants' behalf. Defendants demanding that she—who was not a party in the dispute—pay for the costs of the third-party deposition Quinn Emanuel relentlessly sought (over Mr. Nwaneri, Senior's and Plaintiff's objections). Defendants also used Quinn Emanuel's arbitration lawsuit to harass Plaintiff in various ways, including by admittedly hiring private investigators and process servers to follow and surveil Plaintiff and her close family members, among other efforts by Defendant to intimidate and humiliate Plaintiff after her filing of the discrimination charge.

## ARGUMENT

I.   **DEFENDANTS' FREQUENT RELIANCE ON EXTRA-PLEADING ALLEGATIONS AND EXHIBITS, MISREPRESENTATION OF THE FACTS[i], AND ATTEMPTS TO MALIGN PLAINTIFF ARE IRRELEVANT, MISLEADING, PREJUDICIAL, AND SHOULD BE EXCLUDED BY THE COURT.**

As discussed, in reviewing a motion to dismiss, the Court must consider only the allegations of the complaint, accepted as true, and may not look to assertions of fact beyond those allegations. *See* Fed. R. Civ. P. 12(b)(6). Nonetheless, Defendants try to misdirect the Court's attention to several matters outside the scope of the Amended Complaint, including approximately 40 pages of exhibits, none of which are integral to Plaintiff's allegations. Plaintiff will file a separate motion requesting the Court exclude these matters pursuant to Fed. R. Civ. P. 12(d), but briefly addresses

some of Defendants' false assertions here.  In doing so, Plaintiff does not suggest that it is at all appropriate to consider any of Defendants' extrinsic claims or exhibits; rather, Plaintiff seeks only to demonstrate that discovery will prove Defendants' assertions thoroughly misleading and wrong.

### a. Burck's Unspecified Race is Irrelevant.

Defendants go out of their way to imply that Burck is not white and suggest that Plaintiff "misidentifies" his race.  Defs.' Mem. at 8 n.7; *id.* at 3 n.2 ("spurious").  None of this is accurate.

First, Burck is white — as are his father and spouse — and Defendants identified him as such for years before Plaintiff's external complaints of employment discrimination.  *See* Am. Compl. at ¶ 28.  Defendants' awkward and extrinsic references to his "mom" do not state her race[5] or explain why her lineage matters.  Even if she is a minority and even if Burck currently identifies as one too, it has no bearing on Plaintiff's claims or the sufficiency of the Amended Complaint's allegations.  Membership in a protected class does not immunize a person from discriminating against another from the same class.  *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78 (1998) (Scalia, J.) (discussing the Court's longstanding recognition of same-race racial discrimination and same-sex gender discrimination) (citing *Castaneda v. Partida*, 430 U.S. 482, 499, (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.")).

---

[5] The import of Defendants' reference to Burck's "Jamaican-American mom" is unclear, partly due to the sentence's poor syntax, but also because Jamaica is a multi-racial country made up of European, African, Arab, and Asian descendants.  Similar to having a "South African mom" (which could refer to Charlize Theron or Winnie Mandela), having a Jamaican mother is not indicative of race.

In fact, intra-racial discrimination is common among minorities, as Justice Marshall explained in his concurring opinion in *Castaneda*:

> Social scientists agree that members of minority groups frequently respond to discrimination and prejudice by attempting to disassociate themselves from the group, even to the point of adopting the majority's negative attitudes towards the minority. *Such behavior occurs with particular frequency among members of minority groups who have achieved some measure of economic or political success and thereby have gained some acceptability among the dominant group.*

430 U.S. at 503 (Marshall, J. concurring) (emphasis supplied).  Defendants are familiar with the concept minority-on-minority discrimination.  Shortly after Plaintiff's departure, Quinn Emanuel was sued for racial discrimination based on its pervasive culture of mistreating African-American support staff, including a Latino supervisor's harassment of Black employees, including openly calling Black women "nigger" and asking a Black male employee whether he had been arrested, among other things.  *See Marin v. Quinn Emanuel Urquhart & Sullivan LLP*, No. 17-cv-5488 (S.D.N.Y. 2017).

Second, the Amended Complaint does not identify Burck's race—even in the paragraphs Defendants cite. *See* Am. Compl. at ¶ 1-5 (identifying Shaffer as white, like most of the attorneys in the "almost exclusively white" boys' club).  The Amended Complaint alleges that none of the partners in the D.C. office identified as Black during the time Plaintiff worked there, which fact was confirmed by Defendants' self-reported demographics in the NALP Directory. *See* Am. Compl. at ¶ 28.

### b. Defendants' Purported Bases for Adverse and Retaliatory Actions are Inadmissible, Extrinsic to the Pleadings, and Implausible.

To the extent Defendants seek to raise an affirmative defense to any of Plaintiff's claims, they cannot establish that defense on the basis of the pleadings.  Nonetheless, they place particular emphasis on the alleged "legitimacy" of their decisions to: (1) cancel their representation agreement

with Plaintiff's father-in-law 12 days after receiving Plaintiff's "threat[] to sue the firm," as Defendants described the June 30 letter, and one month after deploying Plaintiff to obtain a $5,500 payment from Mr. Nwaneri; and (2) initiate an arbitration lawsuit against Plaintiff's father-in-law 3 days after receiving Plaintiff's EEOC charge.  Defendants argue "Dr. Nwaneri was a former client of Quinn Emanuel who refused to pay what he owed to the firm," and that Plaintiff "does not dispute these key facts." Defs.' Mem. at 21. "*This is important*," Defendants stress, "because there can be no retaliation if a defendant had a legitimate, non-discriminatory reason for its actions." *Id.* Defendants' assertions are legally impermissible and inappropriate for consideration on a motion to dismiss under Rule 12(b)(6) because they involve matters outside the pleadings.  They are also extremely revealing of Defendants' utter misapprehension and misrepresentation of the legal standard for retaliation.

Even assuming Defendants' withdrawal on the basis of falsely inflated $30,000 bills and Defendants' $20,000 arbitration against Plaintiff's father-in-law were legitimate (and they were not), Defendants' argument that having a "legitimate" basis for their actions precludes a retaliation claim – on a motion to dismiss, no less – has no basis in the law.  Indeed, Defendants fail to cite any legal support for this proposition.  Contrary to Defendants' bewildering argument, the assessment does not end with an employer's mere articulation of a purported non-discriminatory reason, as Defendants would have this court believe.  Stating a purportedly legitimate non-discriminatory reason for a challenged action is only one part of the second step in *McDonnell Douglas*'s three-step burden-shifting analysis (for establishing a claim at trial or summary judgment via the indirect method of proof).[6]  411 U.S. 792 (1973).  The second step requires an employer to satisfy its burden

---

[6] Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case. *Wiley v. Glassman,* 511 F.3d 151, 155 (D.C. Cir. 2007).  Second, the burden shifts to the employer to produce a "legitimate, non-discriminatory reason" for its actions. *Id.*  Finally, if the employer meets its burden

by proffering "adequate" and "admissible" evidence of the stated non-discriminatory reason (which Defendants' motion to dismiss cannot). *See Shea v. Kerry,* 796 F.3d 42, 60 (D.C. Cir. 2015); *Segar v. Smith*, 738 F.2d 1249 at 1268 (D.C. Cir. 1984) ("defendant must make a clear and reasonably specific showing, based on admissible evidence"). And then the burden shifts back to the employee to prove the proffered reason is pretextual. *Shea,* 796 F.3d at 65.

On a motion to dismiss, however, the parties do not reach the second (or even the first) step of *McDonnell Douglas* because the only question is whether Plaintiff's allegations are sufficiently pleaded – *i.e.*, if the Amended Complaint, accepted as true for purposes of this motion, gives rise to the inference that Defendants' actions occurred shortly after, and likely because of, Plaintiff's protected activity. Does the fact that Defendants, whose yearly revenues are nearly $2 Billion, sued Plaintiff's father-in-law for $20,000 three days after receiving Plaintiff's EEOC charge (and used the arbitration as an excuse to deploy private investigators to follow and surveil Plaintiff and demand that she provide testimony and discovery for Defendants even though Quinn Emanuel was already in possession of any evidence relevant to their claims, among other things) give rise to an inference of retaliation? Does the fact that, 12 days after Defendants received what they describe as Plaintiff's "threat to sue the law firm" (and one month after instructing Plaintiff to obtain a $5,500 payment from her father-in-law), Defendants' suddenly dropped Mr. Nwaneri as a client and made numerous slanderous and damaging misrepresentations about Plaintiff on the record in open court give rise to an inference of retaliation? These are only two of the various retaliatory actions alleged in the Amended Complaint, and courts in this District have found less specific and less egregious allegations by plaintiffs sufficient at the motion to dismiss stage. *See, e.g., Smith-Thompson v.*

---

of production, "the burden then shifts back" to the employee to prove that the proffered reason is pretextual. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

*District of Columbia*, 657 F. Supp. 2d 123, 136 (D.D.C. 2009) (finding plaintiff "adequately pleaded" a causal connection between her protected activity and challenged action even though complaint did not state when protected activity ended, when challenged action occurred, or whether her employers knew of her protected complaints).

This is important: Defendants' purportedly "legitimate" bases for their conduct are not convincing, and they are not appropriate for consideration at all (much less admissible as truth) on a Rule 12(b)(6) motion to dismiss.[7] Defendants' brazen attempt to have this Court find as a matter of law that their purported and inadmissible reasons for challenged conduct (which Defendants improperly included in their motion to dismiss in violation of Rule 12(d), and which are not an admissible proffer under any of this Circuit's precedent, including *Brady*) absolves them of any liability for retaliation is disturbing. Defendants apparently believe that shoving a purported and implausible justification for their actions into a motion to dismiss ends the retaliation inquiry. It does not, and it cannot, on a Rule 12(b)(6) motion to dismiss. It is inadmissible, unsworn attorney hearsay. *See Brady v. Office of Sergeant at Arms*, 520 F. 3d 490, 494 (D.C. Cir. 2008) (noting employers assert reasons for challenged decisions through "declaration, deposition, or other

---

[7] As discussed in Plaintiff's November 3, 2020 Notice of Deficiencies, Defendants' motion flagrantly violates Fed. R. Civ. P. 12(b)(6) and the Court's Standing Order. Defendants did not request the Court take judicial notice of these documents, but to the extent that the Court decides to judicially notice them pursuant to Fed. R. Evid. 201, none of Defendants' exhibits, including any court records, would be admissible for the truth of the matters asserted therein. "A court cannot take judicial notice of the truth of a document simply because someone put it in the court's files. That common sense limitation on judicial notice is particularly apt in a case where the court purports to treat a noticed fact as preclusive. If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *Hurd v. D.C.*, 864 F.3d 671, 686 (D.C. Cir. 2017) (citation and internal quotation marks omitted). Defendants' extrinsic exhibits "do not present a full or fair picture" of any matter raised here. *Id.*

testimony from the employer's decisionmaker," and present them to the court in a "motion for summary judgment or judgment as a matter of law").[8]

### c. Defendants' Habitual Misrepresentations to this Court and Others are Extensive.

It also bears mentioning that the entire premise of Defendants' argument is, in fact, false. Defendants claim Plaintiff "never disputes the key facts. Dr. Nwaneri was a former client of Quinn Emanuel who refused to pay what he owed to the firm." Defs.' Mem. at 21. First, Plaintiff's allegations explicitly "dispute" Defendants' assertion: the Amended Complaint states that Mr. Nwaneri offered to make payment to Defendants several times and *Defendants* refused to accept payment. *See, e.g.,* Am. Compl. at ¶ 79 ("As Corey's July 20, 2016 email said: "I will not continue to engage with you". Mr. Nwaneri reached out to Corey and Quinn Emanuel several other times to offer payment on the corrected balance (as he had done on a monthly basis for the entire year), Defendants repeatedly refused to accept any payment from him (even refusing to accept any payment at the September 2016 hearing on the motion to withdraw).").

Misrepresenting facts is such second nature to Defendants that they lie about lying. For example, their description of the underlying facts (*i.e.,* that Mr. Nwaneri "refused to pay") is untruthful, and Defendants pile onto to their dishonesty by falsely claiming that Plaintiff's allegation (*i.e.,* that Mr. Nwaneri offered to pay and that Defendants refused to accept payment) are "incorrect."

---

[8] The relevant question for retaliation is not simply whether Defendants can state an ostensibly non-discriminatory reason for its actions, it is whether that reason is the credible (i.e, whether Defendants would have taken that action if Plaintiff had not engaged a protected activity), and in the third part of the analysis (assuming an employer meets their burden of production), whether the employee can prove that the stated reason is not the true reason. The answers to those questions are only available through discovery, which is another reason why Defendants' attempt to do an end-run around the entire analysis at the pleading stage is legally unsound, unacceptable, and should be rejected in its entirety.

Defs.' Mem. at 21.  This too is patently false, and Defendants' own words at the motion to withdraw hearing expose the falsity of their representation in the motion to dismiss.  Quinn Emanuel not only refused to accept payment from Mr. Nwaneri or otherwise correct the $10,000 overcharge in the motion to withdraw bills before the hearing, but Defendants refused to accept payment at the hearing in open court and on the record, as alleged in the Amended Complaint and confirmed by the hearing transcript.  *See* Ex. 3, Motion to Withdraw Hearing, at 22:20-23:19 (After a recess for Quinn Emanuel and Mr. Nwaneri to settle the payment dispute off the record, Mr. Nwaneri stated: "Your Honor, I offered to pay them so they can continue with my case, and they still don't want to continue…. That tells me they didn't really - - that the issue about money wasn't really the issue as they claim."  Defendants responded by acknowledging Mr. Nwaneri's offer to pay, but refusing to accept payment or continue representation under any circumstances: "I understand that Dr. Nwaneri is willing to pay…. [but] we [Quinn Emanuel] maintain we would like to withdraw as counsel.").  The Amended Complaint and hearing transcript make clear that, if anything, Defendants' assertions "incorrect," "spurious," and "fabricated"—not Plaintiff's allegations.[9]

Defendants have always been comfortable fabricating allegations about Plaintiff and being untruthful to courts.  Take, for example, Defendants' several misrepresentations to the Maryland state court throughout the motion to withdraw.  *See, e.g.,* Ex. 3, MTW Hearing Trans. at 26:7-12 (claiming that Plaintiff's June 30, 2016 letter "threaten[ing] to sue Quinn Emanuel" was sent "after

---

[9] Defendants' repeated insinuations about Plaintiff's credibility are unwarranted and particularly improper on a motion to dismiss.  For purposes of this motion, Plaintiff's allegations must be taken as true and all reasonable inferences made in her favor.   Yet Defendants repeatedly (and inappropriately) allege that Plaintiff's allegations are "distorted" or "false"—without providing a shred of support for these claims.  *See, e.g.,* Defs.' Mem. at 21 (claiming the allegations are "fabricate[d] and distort[ed] facts," without identifying the allegations to which Defendants are referring); *id.* at 25 (describing allegations as "are roundly false," without identifying what claims Defendants claim to be inaccurate).

Quinn Emanuel filed the motion to withdraw" on July 18, 2016); *id.* at 3 (alleging that Plaintiff worked at Quinn Emanuel through the end of "July 2016"); *id.* at 3 (representing that Plaintiff was "discharged" at the end of July 2016 because she had done "little to no work between April and July 2016").

**II.**    **Plaintiff's Claims for Retaliation and Retaliatory Harassment are Timely and Sufficiently Pleaded under Section 1981, Section 1985, DCHRA, Title VII, PDA, FMLA, and DCFMLA.**

The Amended Complaint alleges claims for retaliation and retaliatory harassment under 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1985(3) ("Section 1985(3)"), Title VII of the Civil Rights Act of 1964 ("Title VII") and as amended by the Pregnancy Discrimination act of 1978 ("PDA"), FMLA, DCFMLA, and the D.C. Human Rights Act of 1977 ("DCHRA").   Defendants concede that Plaintiff's retaliation claims against Defendants relating to conduct after May 6, 2015 is timely, *see* Defs.' Mem. at 19, but argue that any the retaliation claims from May 5, 2015 and earlier should be dismissed because: (a) they are untimely as to the Individual Defendants; (b) Plaintiff, who was neither party nor privy to the earlier actions, should be collaterally estopped from alleging retaliation based on Defendants' actions against Mr. Nwaneri—even as to Defendants' actions directly involving Plaintiff; and (c) the allegations do not state a claim for relief.  *See* Defs.' Mem. at 11-12, 19-24.  Defendants' arguments lack merit and should be disregarded.

**a.**   **Plaintiff's Claims Against the Individual Defendants are Timely and Otherwise Relate Back to the Original Complaint.**

Defendants baldly assert that any claims against the Individual Defendants are untimely because "any colorable employment claims necessarily accrued before September 17, 2016" and do not relate back to the filing date of the original complaint. Defs.' Mem. at 12.  This conclusory assessment has no legal basis.

**FIRST FORTY-FIVE PAGES ONLY**

First, Defendants misstate the legal standard for retaliation by asserting that any of Plaintiff's claims against the Individual Defendants necessarily arose before September 17, 2016. Defendants assume, without citation to any legal authority, that former employees cannot raise claims after the end of their employment. This is fundamentally wrong and has been explicitly rejected by the Supreme Court. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 346 (1997) (finding former employees are "employees" under antiretaliation law and that holding otherwise would allow "an employer to be able to retaliate with impunity against an entire class" of prohibited acts); *Burlington Northern v. White*, 548 U.S. at 67 (holding that antiretaliation protection "extends beyond workplace-related or employment-related retaliatory acts and harms"). Defendants ignore these precedents.

Several of Plaintiff's claims against the Individual Defendants are timely even based on the date of the Amended Complaint's filing, September 17, 2020. As alleged in the Amended Complaint, Defendants took numerous retaliatory actions against Plaintiff and her close family members between 2016 until the present, which are squarely within the four-year statute of limitations for Section 1981 claims. *See* Am. Compl. at ¶¶ 106-113, 130-138 (alleging claims for retaliation and retaliatory harassment against Quinn Emanuel and the Individual Defendants under Section 1981 has 4-year limitations period). Because many of the events underlying these claims (including Defendants' retaliatory arbitration in 2017) occurred during the 4-year period between September 2016 and September 2020, these claims are timely with respect to the Individual Defendants and Quinn Emanuel and there is no need for relation back.[10]

---

[10] Similarly, Plaintiff's claim against the Individual Defendants alleging civil conspiracy and retaliation is also timely under Section 1985(3) are also timely based on the filing of the Amended Complaint. See Am. Compl. at ¶¶ 155-162; 42 U.S.C. § 1985(3) (subject to 3-year limitations period based on District of Columbia's general statute of limitations under D.C. Code. § 12-301(8)).

Second, any claims concerning the Individual Defendants' conduct before September 2016 satisfy Rule 15's requirements for relation back to the filing date of the original complaint.[11] Fed. R. Civ. P. 15(c). Rule 15(c) provides that an amended pleading relates back to the date of the original pleading when the amendment asserts claims arising out of the same events; and the party to be brought in by amendment (i) "received such notice of the action that it will not be prejudiced in defending on the merits," and (ii) "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). Defendants do not challenge the fact that the amendments arise out of the same events, or that they received notice such that they would not be prejudiced.[12] "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin County Welcome*

---

[11] As Plaintiff has repeatedly stated from the outset of this litigation, including Plaintiff's Notice of Defendant's Failure to Properly Effect Service, see Dkt. 14 at 2, and Plaintiff's Opposition to Defendants' Motion to Dismiss, *see* Dkt. 21 at 11, the envelope containing the original complaint was time-stamped at 11:58pm on May 6, 2019, after which point the party filing the document on Plaintiff's behalf also time-stamped the complaint itself out of an abundance of caution (which reads 12:02am on May 7, 2019).

[12] Nor could Defendants argue lack of notice or that they suffered any prejudice. Notice may be informal or informal, and Defendants received notice when service was effected on Quinn Emanuel, and when Defendants received a copy of the complaint via the Case Management/Electronic Case Filing system in May 2019, which facts Defendants did not (and could not credibly) contest in their motion to dismiss. Because Quinn Emanuel was properly served and has been a party to the case since 2019, the Individual Defendants would not be prejudiced by having to defend against these claims on the merits. *See* Fed. R. Civ. P. 15(c)(1)(C)(ii); *Brown v. Georgia Dept. of Revenue*, 881 F. 2d 1018, 1021 (11th Cir. 1989) (service on entity was sufficient notice to individual board members and "[s]ince [entity] had been a party to the case, there was no prejudice from the late amendment naming the board members"). All three Individual Defendants have been equity partners at Quinn Emanuel for many years and on notice of Plaintiff's claims and their specific involvement since 2016 (based on Plaintiff's complaints, including the June 30, 2016 letter) and 2017 (based on Plaintiff's EEOC charge). Burck, in particular, remains a managing partner of the D.C. office, which has been representing Quinn Emanuel since the beginning of this matter, and has exercised control over this matter from the outset. Given the Individual Defendants' immediate notice of, and extensive involvement in, the matter from the outset, none of the them would be prejudiced by defending on the merits.

*Center v. Brown*, 466 U.S. 147, 149 n.3 (1984); *see Goodman v. Praxair, Inc.,* 494 F. 3d 458, 471 (4th Cir. 2007) ("When the new party has been given fair notice of a claim within the limitations period and will suffer no improper prejudice in defending it, the liberal amendment policies of the Federal Rules favor relation-back.").

Defendants' argument is based on their mistaken assumption that Plaintiff made a "considered judgment not to sue the Individual Defendants in the original complaint, as reflected in the case caption," Defs.' Mem. at 11-12, which is neither correct nor relevant.  Like most of Defendants' assertions, they present conjecture as fact without offering any factual or legal support.  The failure to name a party in a case caption does not determine whether a prospective party can be added to a lawsuit, nor is it "preclusive" as Defendants claim. *Id.*  Indeed, in every case where a party invokes Rule 15(c) to add a prospective party's name, the prospective party was not named in the caption. If Defendants' assessment were correct (it is not), there would be no need for Rule 15(c)(3)'s existence.

More importantly, Plaintiff's knowledge is largely irrelevant for Rule 15(c)(3)'s purposes. Whether an amendment relates back for purposes of an added party is primarily — and in most cases, only — concerned with what the prospective defendant knew or should have known. "Relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's knowledge or its timeliness in seeking to amend the pleading." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 541 (2010).  Defendants' sole argument is that the Individual Defendants "could not possibly have known" they were meant to be sued, Defs.' Mem. at 11; but this is not plausible under any of the circumstances.  The Individual Defendants are (or were) equity partners at Quinn Emanuel and therefore principals of the partnership; suing the entity necessarily meant suing them.  Further, the complaint described their individual conduct, and

Defendants are well aware that DCHRA and Section 1981 provide for individual liability under these circumstances. *See, e.g.*, Compl. at ¶ 5 (seeking to remedy Defendants' "ongoing retaliation against [Plaintiff] and her close family members, led by the managing partners of the D.C. office [Burck and Corey] and other senior named partners at the law firm [Shaffer]").

That the Individual Defendants knew they were being sued is underscored by Defendants' argument in the first motion to dismiss. For example, when challenging Plaintiff's civil conspiracy claim, Defendants argued that Plaintiff "makes allegations only against Quinn Emanuel partners and employees." Dkt. 10 at 22. Defendants' acknowledgement that Plaintiff's claims directly implicated Quinn Emanuel partners and their conduct confirms that they knew (or should have at least suspected) that the Individual Defendants were proper defendants. *See Krupski*, 560 U.S. at 555 (noting that respondent "should suspect a mistake has been made when [a related entity] is named in a complaint that actually describes [respondent's] activities"). Allowing Defendants to escape liability for any claims under these circumstances, where they concede notice and lack of prejudice, is not consistent with Rule 15's underlying policies. *Goodman v. Praxair, Inc.,* 494 F. 3d 458, 471 (4th Cir. 2007) ("The policy considerations of Rule 15(c) concern whether the repose granted by statutes of limitations is preserved for parties named in amended pleadings. And that depends on the notice to and effect on the new party. The limitations of Rule 15(c)(3) thus only apply when the policies underlying limitations rules may be trampled.").

Relation back is also appropriate here because Defendants share an identity of interests. "Although Rule 15(c) only refers to an amendment 'changing the party,' a party may be added when the requisite notice and identity of interests showings are made." *See Stoppelman v. Owens*, 580 F.Supp. 944, 946 (D.D.C. 1983). "A current party and new party have an 'identity of interest' if they 'are so closely related in their business operations or other activities, that the institution of an

action against one serves to provide notice of the litigation to the other." *Bayatfshar v. Aeronautical Radio*, Inc., 934 F. Supp. 2d 138, 144 (D.D.C. 2013) (citing *Singletary v. Penn. Dep't of Corr.*, 266 F.3d 186, 197 (3d Cir.2001)). Such is the case here, where, Defendants share the same attorney (despite their conflicting defenses and the likely conflict of interests)[13], which "eliminates any worry that [any Individual Defendant] was caught by surprise when the complaint was amended." *Goodman*, 494 F. 3d at 474 (amended complaint related back as to additional defendant because that party and original defendant were closely related and employed same attorneys). Defendants are not entitled to repose because could not have "legitimately believed that the limitations period had passed without any attempt to sue"; this is a case where "[r]epose would be a windfall for [defendants] who understood, or who should have understood, that [they] escaped suit during the limitations period only because [of an omission]." *Krupski*, 560 U.S. at 550.

**b. Defendants' Argument that Plaintiff's Retaliation Claims are Barred by Issue Preclusion or Lack of Standing Fail Because Defendants Apply the Wrong Legal Standard and Ignore the Allegations of the Amended Complaint.**

Defendants claim (1) that they are entitled to issue preclusion based on prior actions which involved different issues and to which Plaintiff was never a party; (2) that Plaintiff's retaliation claims should be dismissed because Plaintiff "lacks standing"; (3) that they had a purportedly legitimate basis for withdrawing as Mr. Nwaneri's counsel in 2016 based on inflated bills (12 days

---

[13] Here, the same attorney—Richard Smith, a partner in Quinn Emanuel's Washington, D.C. office—represents Quinn Emanuel and Individual Defendants Burck, Shaffer, and Corey. Burck is the managing partner of the Washington, D.C. office, Shaffer is based there, and Corey was a co-managing partner in that office before his abrupt departure and relinquishment of several state bar licenses during the pendency of Mr. Nwaneri's bar complaints. Defendants' attorney Smith reports to Burck and is in close proximity to Shaffer and Corey. This suggests the Individual Defendants have not only had notice and possession of the original complaint since its initial filing in May 2019, but that the Individual Defendants have also exercised control over this litigation from its outset. *See Miller v. Holzmann*, Civ. No. 95-1231, 2007 WL 778599, at *2-3 (D.D.C. Mar. 6, 2007) (amendment adding defendant related back to prior complaint because all defendants were closely-related members of same corporate family and represented by same counsel).

after receiving another internal complaint from Plaintiff's then-employment counsel about Defendant's unlawful conduct) and for suing Mr. Nwaneri in 2017 (3 days after receiving Plaintiff's charge of employment discrimination) seeking fees that Defendants refused to correct or accept payment for in 2016; and (4) that Plaintiff "did not plead she suffered a proper material [sic] adverse action." Defs.' Mem. at 19.  Each of Defendants' arguments fail because Defendants apply the wrong legal standard and ignore the allegations in the Amended Complaint.  Defendants' argument for nonparty issue preclusion is especially groundless, as confirmed by Defendants' failure to provide any authority for the blanket assertion that Plaintiff's claims are precluded by earlier actions to which she not a party nor a privy.

> i. **Plaintiff has standing under Article III to Assert Retaliation Claims Against Defendants Based on Defendants' Direct Retaliation and Third-Party Reprisals.**

To the extent Defendants argue that Plaintiff lacks standing to bring any retaliation claims, Defendant's argument is absurd. *See* Defs. Br. at 20-21 (claiming "Nwaneri lacks standing to bring a claim of retaliation based on [Defendants' fee dispute with Mr. Nwaneri]").  Plaintiff's retaliation claims are comprised of various actions Defendant took against Plaintiff directly, for which she unquestionably has standing to sue under Article III. *See, e.g.,* Am. Compl. at ¶ 45 ("After the [July 2015] meeting, Shaffer and Burck retaliated against Plaintiff again by drastically reducing her role on the case, marginalizing her, and transferring her case assignments and supervisory responsibilities to a white male associate"); *id.* at ¶ 46 ("Less than a week after Plaintiff's meeting with Corey [regarding Shaffer's discriminatory and harassing conduct], however, Burck and Shaffer

removed Plaintiff her from the matter entirely without notice and replaced her with another white male associate.").[14]

Defendants' claim that Plaintiff has failed to state injuries resulting from their retaliation also ignores the Amended Complaint's allegations, which allege both economic and non-pecuniary injuries as a result of Defendants' retaliations. *See, e.g., id.* at ¶¶ 136 and 137 ("Plaintiff has suffered and continues to suffer monetary damages, including, but not limited to, loss of past and future income, compensation and benefits" and "severe mental anguish and emotional distress" as a "direct and proximate result" of Defendants' conduct).

Likewise, Plaintiff has standing to sue Defendants for their retaliatory conduct against her during their withdrawal of representation from Mr. Nwaneri's case and their arbitration lawsuit. These retaliations were directed at Plaintiff, including Defendants' false and damaging claims about Plaintiff during the September 2016 hearing on the motion to withdraw, *id.* at ¶ 81, and Defendants' use of the 2017 arbitration to harass Plaintiff by demanding she provide unnecessary discovery and appear as a nonparty to provide testimony for Defendants against Plaintiff's father-in-law,[15] *id.* at ¶¶ 86-87, and using the arbitration and nonparty deposition subpoena as a guise for Defendants'

---

[14] *Id.* at ¶ 132 ("Defendants' unlawful retaliation includes, but is not limited to, deciding in July 2015 to deny partnership or promotion consideration to Plaintiff without cause and in contravention of the law firm's policies, deciding in August 2015 to wrongfully terminate Plaintiff's employment without justification, and making extensive post hoc efforts to find or otherwise manufacture a justification for Defendants' July and August 2015 decisions by subjecting Plaintiff to heightened and unprecedented scrutiny, along with affirmative acts intended to suppress Plaintiff's billable hours).

[15] Defendants had no legitimate need for Plaintiff's nonparty testimony, but insisted (over several objections) that she appear as a on Defendants' behalf.  Plaintiff was a former employee, Defendants were already in possession of all relevant information for their claim for fees against Mr. Nwaneri, Plaintiff's availability was limited as she was the primary caregiver for a newborn and 3-year-old, and Plaintiff's EEOC Charge was pending—as Defendants were well aware given their initiation of the arbitration three days after receiving Plaintiff's EEOC charge. *Id.*

"admitted use of investigators" to "stalk and surveil" Plaintiff and her family, at home (including an address Quinn Emanuel obtained from Plaintiff's EEOC Charge), school, and work, *id.* at ¶ 88.

Plaintiff is within the zone of interests protected by the antiretaliation statutes alleged in the Amended Complaint, and therefore has standing to sue based on Defendants' indirect retaliation against her. As the Supreme Court has recognized, employers often take materially adverse actions against a current or former employee who engaged in protected activity by harming a third party who is closely related to the complaining party. *See Thompson v. North American Stainless*, 131 S.Ct. 863, 868 (2011) (stating third-party reprisals are actionable under antiretaliation statutes by any plaintiff within the "zone of interests" protected by statute).

The Amended Complaint states claims for retaliation based on Defendants' third-party reprisals against Plaintiff, including Defendants' actions involving Mr. Nwaneri, whom Defendants used to retaliate against Plaintiff by proxy. *See, e.g.,* Am. Compl. at ¶¶ 106-113. Contrary to Defendants' bald claim that "the doctrine of third-party standing does not apply in the present circumstances," Defs.' Mem. at 20, Plaintiff's ability to sue based on third-party reprisal is not a "doctrine" to be invoked. It is a fundamental aspect of the current jurisprudence on retaliation. *Thompson,* 562 U.S. at 868 (construing antiretaliation provisions broadly to "enable[e] suit by any plaintiff with an interest arguably [sought] to be protected by the statute") (citation and internal quotation marks omitted); *Burlington Northern v. White*, 548 U.S. 53, 67 (2006) (broadly construing antiretaliation provisions to include wide range of employer conduct). As the true target of Defendants' retaliation, Plaintiff is squarely within the zone of interests as the primary party protected by the antiretaliation provisions of Sections 1981 and 1985(3), Title VII, DCHRA, PDA, FMLA, and DCFMLA.

### i. The *Noerr-Pennington* Doctrine Does Not Apply to This Case.

Defendants' assertion that their conduct towards Plaintiff during their lawsuit against Plaintiff's father-in-law is protected the First Amendment and the *Noerr-Pennington* doctrine is meritless. The *Noerr-Pennington* doctrine is usually limited to antitrust cases and protects activity implicating the First Amendment right to petition the government for redress.[16] *See generally California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508 (1972); *U.S. v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1123 (2009) (stating *Noerr-Pennington* doctrine "protects an attempt to persuade the legislature or the executive to take particular action with respect to the law") (citation and internal quotation marks omitted). The doctrine does not apply here because the proceedings Defendants claim warrant *Noerr-Pennington* protection – including a private arbitration – do not constitute "petitioning" the government" under the doctrine or the First Amendment. "The protection does not cover activity that was not genuinely intended to influence government action." *Id.*

Even if the *Noerr-Pennington* doctrine were applicable, Defendants would not be entitled to immunity because "the doctrine does not protect deliberately false or misleading statements." *Id.; see Kottle v. Nw. Kidney Cntrs.,* 146 F.3d 1056, 1060 (9th Cir. 2006) (applying "sham exception" where "defendant's conduct includes fraud upon the court or intentional misrepresentations to the

---

[16] Defendants' only authority for this doctrine is an unpublished report of Findings and Recommendations from a U.S. Magistrate Judge in California, *see Ungureanu v. A. Teichert & Son,* No. 11-cv-0316 (unpublished) (E.D.Cal. 2012), which confirms the limited use of the doctrine outside the antitrust context. Should the Court consider it, the case is inapposite here. There, the plaintiff claimed his employer's statements in a workers compensation hearing were discriminatory. Here, Plaintiff alleges here differ and concern Defendants' use of the other proceedings themselves as retaliation and harassment. *See Burlington-Northern* (explaining discrimination and retaliation claims are analyzed differently, with retaliation claims covering broader range of conduct). Also, Defendants' conduct does not warrant protection because it falls under the sham exception based on their serial misrepresentations to and fraud upon the court, as discussed.

court that deprive the litigation of its legitimacy"). As alleged, Defendants' withdrawal was based on the falsely inflated bills that Defendants refused to correct or accept payment for; Defendants made numerous misrepresentations to the court in their motion to withdraw and during the hearing, including blatant falsehoods about Plaintiff, as confirmed by the hearing transcript. "[N]either the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *Philip Morris,* 566 F.3d at 1123.[17]

### ii.  Defendants Apply the Wrong Legal Standard for Retaliation.

When analyzed under the appropriate legal standard, the Amended Complaint's allegations exceed the plausibility standard required at the motion to dismiss stage. Defendants, however, apply the wrong legal standard to Plaintiff's retaliation claims, arguing they should be dismissed because Plaintiff did not suffer an "adverse action" or "adverse employment action." *See, e.g.,* Defs.' Mem. at 19. The current standard of harm for a retaliation claim is "a materially adverse action," *i.e.,* an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination" — not an "adverse employment action," as Defendants would have the Court believe. *See Burlington N. & S.F.R. Co. v. White,* 548 U.S. 53, 68 (2006) (distinguishing between antiretaliation and antidiscrimination provisions of Title VII[18], and establishing broader "materially

---

[17] To the extent the *Noerr-Pennington* doctrine applies at all to this case, it would protect Plaintiff from Defendants' baseless threats to seek Rule 11 sanctions. *See* Defs.' Mem. at 2 n.1. Unlike Defendants' rampant misrepresentations throughout prior proceedings (which preclude Defendants from the doctrine's immunity), none of Plaintiff's allegations fall within the "sham" exception.

Defendants' argument that Plaintiff's claims implicate the FAA is also meritless, as the Federal Arbitration Act does not apply to persons who were not party to the arbitration.

[18] Retaliation claims under Title VII and Section 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework. *See Bryant v. Pepco,* 821 F.Supp.2d 304, 304-307 (D.D.C.2011); *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir. 2010). Claims alleging discrimination under Title VII and Section 1981 also apply the same framework. *Ayissi-Etoh v. Fannie Mae,* 712 F.3d 572, 576 (D.C. Cir. 2013).

adverse action" standard for retaliation claims, which are intended to cover wider range of conduct than antidiscrimination provisions).

In arguing that Plaintiff's retaliation claims should be dismissed for failure to plead an "adverse action," Defendants are misapplying the standard for discrimination claims to Plaintiff's claims for retaliation (which are subject to the "materially adverse action" standard established in *Burlington Northern,* 548 U.S. at 68). Courts have repeatedly been reversed for taking the approach Defendants advocate here. *See, e.g., Mogehan v. Napolitano,* 613 F.3d 1162, 1166 (D.C. Cir. 2010) (reversing grant of summary judgment because district court applied pre-*Burlington Northern* standard to retaliation claim); *Davis-Garrett v. Urban Outfitters*, No. 17-3371, slip op. at 33 (2d Cir. April 8, 2019) (same, stating pre-*Burlington Northern* "adverse action" standard was "no longer the current state of the law"). The "proper question for a retaliation claim is whether the [challenged conduct] could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." *Id.*

A reasonable worker would be dissuaded from making an internal complaint if she knew that doing so would result in the immediate cancellation of a contract between her employer and close family member under false pretenses. Likewise, a reasonable worker might well be dissuaded from engaging in protected conduct if she knew her employer would make false and slanderous representations about her in public, on the record in open court. As Plaintiff has alleged, Defendants cancelled their representation agreement with Plaintiff's 70-year-old father-in-law 12 days after receiving the June 30, 2016 letter from Plaintiff's employment counsel (which Defendants described as a "threat to sue Quinn Emanuel"), claiming their withdrawal was on the basis of falsely inflated invoices for which that Defendants refused to accept payment or to correct. Instead, Defendants made numerous misrepresentations to the court about Plaintiff and her father-in-law in their motion

to withdraw and in open court at the September 2016 hearing on Defendants' motion to withdraw, including publicly maligning Plaintiff on the record in open court. *See* Am. Compl. at ¶¶ 77-82.

A reasonable worker would also be "dissuaded from making a charge of discrimination" if she knew that, 3 days after submitting a charge of discrimination to the EEOC and relevant authorities, the employer (which grosses Billions of dollars per year in revenue) would sue her elderly father-in-law for $20,000, and then abuse that legal proceeding to, among other things:

(a) seek unnecessary discovery and nonparty testimony from the employee Defendants wrongfully terminated, during the pendency of the EEOC investigation;

(b) demand that the former employee (who was not a party to the lawsuit) appear as the *employer's* witness against her close family member in the $2 Billion employer's quest for $20,000;

(c) refuse to pay any of the costs associated with the nonparty testimony the employer insisted on over multiple objections, including the statutorily required $40 witness fee;

(d) abusing the information provided in the EEOC charge to harass the former employer by:

(1) hiring private investigators to surveil the former employee and her family at the address stated on the EEOC charge sheet;

(2) needlessly contacting the former employee on and otherwise demanding that the former employee appear the nonparty testimony on key dates stated in the EEOC charge, including: (i) the 2nd anniversary of her mother's death, and (ii) on her daughter's 2nd birthday;

(e) repeatedly sending process servers and other agents to the former employee's address to serve the former employee in-person with the subpoena for testimony days after the former employee had already agreed to electronic service and acknowledged receipt of the e-mailed subpoena; and

(f) demand the former employee's elderly father-in-law pay hundreds of thousands of dollars in self-paid "fees" for the $2 Billion employer's efforts to collect $20,000.

*See, e.g.,* Am. Compl. at ¶¶ 17, 83-89. As alleged, Defendants' conduct against Plaintiff and her close family member throughout the 2017 arbitration (which Defendants initiated 3 days after receiving Plaintiff's EEOC charge of discrimination) would terrify anyone. It most certainly would dissuade a reasonable worker from filing a charge of discrimination. *See id.*

### iii. None of Plaintiff's Retaliation Claims are Barred by Collateral Estoppel Because Plaintiff was Neither Party Nor Privy to the Earlier Actions.

Without any legal authority or explanation, Defendants proclaim that Plaintiff's retaliation claims relating to Defendant's conduct in the 2016 motion to withdraw, 2017-2018 arbitration lawsuit, and related proceedings "are barred by issue preclusion." *See* Defs.' Mem. at 20-21 n.17. The basis for Defendants' argument is unclear[19], but they to claim that Plaintiff — who was not a party to the arbitration agreement or the prior actions — cannot assert retaliation because "Mr. Nwaneri has litigated the very same issues and lost." *Id.* at 22. This is wrong as a matter of fact and law.

First, Defendants' argument is patently unconstitutional and devoid of legal authority, as confirmed by their failure to provide any applicable law in support of the proposition that a person who was not a party or a privy to an earlier prior proceeding may be bound by any findings from those proceedings.[20] Despite Defendants' extensive efforts to seek discovery from Plaintiff and to subpoena her nonparty testimony in the 2017 arbitration, Plaintiff was not a party to any of the prior proceedings.[21] Even so, Defendants ask the Court to apply collateral estoppel to Plaintiff's claims

---

[19] Although Defendants claim "issue preclusion" in the section heading, they only discuss it in a footnote without reference to applicable case law. *See id.*

[20] Defendants' request for issue preclusion based on the findings of a paid arbitral tribunal (when Plaintiff was not a party to the arbitration or the agreement to arbitrate) is especially dubious. Federal courts may use arbitral findings as evidence in employment discrimination cases*, see Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) (listing factors to be considered), but there are various limitations on when arbitration awards may be given preclusive effect—even when they involve the same parties. *See Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684 (1992) ("If the basis of the [arbitrator's] decision is unclear, and it is thus uncertain whether the issue was actually and necessarily decided in [the arbitration proceeding], then relitigation of the issue is not precluded."). There is no precedent for Defendants' efforts to seek issue preclusion on a nonparty's claims on the basis of the findings of a paid arbitral tribunal.

[21] Nor is Plaintiff in privity with Mr. Nwaneri. "A privy is one so identified in interest with a party to the former litigation that he or she represents precisely the same legal right in respect to the subject matter of the case." *Smith v. Jenkins*, 562 A. 2d 610, 615 (D.C. 1989). Such is not the case here.

under a patently absurd theory of nonparty nonmutual collateral estoppel that is not supported by the law and is categorically unconstitutional.  Precluding a plaintiff from raising claims—based on an earlier ruling from a case that did not involve the current Plaintiff, in which the current Plaintiff had no opportunity to raise claims, and which involved different issues than those of the instant lawsuit—is a blatant due process violation.  *See* U.S. Const., amend. IX.[22]  Extending the preclusive effect of another court's judgment to a person who was not party to the earlier action conflicts with the "deep-rooted historic tradition that everyone have his own day in court." *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996); *see Hansberry v. Lee*, 311 U.S. 32, 40 (1940) ("One is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.").

Second, Defendants' concocted collateral estoppel argument conflicts with their earlier representations to the Court.  Defendants' current argument that the Amended Complaint raises the "very same issues" as the prior proceedings directly contradicts Defendants' previous claim that the fee dispute with Mr. Nwaneri had no connection to this case or Plaintiff's claims.  In reply to

---

As Defendants are well aware, Plaintiff could not have represented the same legal right as Mr. Nwaneri in respect to the arbitration, as reflected by Defendants' attempts to call Plaintiff as their witness against him in the arbitration.  As a former employee of Defendants, Plaintiff was in an entirely different legal position vis-à-vis Defendants than Mr. Nwaneri, who was a client of Quinn Emanuel and the Individual Defendants (in particular Corey, who was the "engagement partner" for Mr. Nwaneri's matter and signed the representation as such).  As Defendants' client, Mr. Nwaneri was owed a greater duty of care than an employee, as Defendants were his attorneys and fiduciaries.

[22] There is no support in the Amended Complaint, or reality, for Defendants' suggestions that Plaintiff could be suing "on behalf of" or may have a "shared financial interest" with Mr. Nwaneri (which Defendant claims would require revocation of Plaintiff's status as a party proceeding *in forma pauperis*), none of which is true.  Defendants' conjecture about Plaintiff's *in forma pauperis* status is particularly specious given Defendants' demonstrated lack of knowledge about the *in forma pauperis* process or relevant statute, 28 U.S.C. § 1915.  *See* Order Denying in Part Defendants' Motion to Dismiss, Aug. 10, 2020 (rejecting Defendants' opening argument alleging service deficiencies "because Nwaneri is proceeding *in forma pauperis* [and] entitled to rely the United States Marshal to effectuate service of process").

Plaintiff's opposition to Defendants' motion to dismiss to original complaint, Defendants claimed that the prior proceedings were "unrelated" to Plaintiff or any of her claims. *See* Dkt. 23 at 7 ("Nwaneri seeks to litigate in parallel issues regarding an unrelated fee dispute between Quinn Emanuel and Nwaneri's father-in-law"). Now that it is convenient, however, Defendants have reversed course. Despite telling this Court that the prior litigations were "unrelated" in their earlier motion to dismiss filings, Defendants now contend that the "unrelated" proceedings involve the "very same issues," so much so that findings from the prior proceedings should be given preclusive effect (against a nonparty). These positions are mutually exclusive and characteristic of Defendants' barefaced double-talk. Having already claimed the fee dispute and associated proceedings were "unrelated," as Defendants put it, *see id.*, Defendants cannot now credibly assert that any of the findings from the earlier proceedings should be given any preclusive effect with respect to Plaintiff's claims.

Finally, even if nonparty collateral estoppel were not unconstitutional, Defendants do not satisfy any of the required elements. Defendants rely on the wrong legal standard again and cite two off-point federal cases, *see* Defs.' Mem. at 20-21 n.17. Issue preclusion, however, is governed by state law under these circumstances, not federal law.[23] *See Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 US 280, 294 (2005). Under D.C. law, issue preclusion is only available when "(1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3)

---

[23] In addition to citing only federal law, Defendants also confuse claim and issue preclusion. Defendants state that they seek collateral estoppel, but the first case cited concerns only claim preclusion. *See id.* (citing *Ethnic Employees of Library of Congress v. Boorstin,* 751 F.2d 1405 (D.D.C. 1985)). The other case briefly discusses issue preclusion but not as it applies to nonparties, which is primary issue here, *see Scahill v. District of Columbia,* 271 F.Supp.3d 216, 225 (D.D.C. 2017). Neither addresses the preclusive effect of arbitral awards on persons who were not parties to the agreement to arbitrate or the arbitration proceedings.

after a full and fair opportunity for litigation by the parties or their privies; and (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *Davis v. Davis,* 663 A.2d 499, 504 (D.C. 1995) (citation omitted). Defendants bear the burden of establishing these elements, *id.,* and have not bothered to mention or apply the legal standard for issue preclusion.

Nor can Defendants satisfy any of these elements required for collateral estoppel. The issues for which Defendants seek preclusion were not "litigated," "determined," or "essential" in the earlier proceedings, contrary to Defendants' repeated[24], yet unsupported, claims to the contrary. *See, e.g.,* Defs.' Mem. at 23 ("With courts and tribunal having so adjudged[25] multiple times, Nwaneri cannot properly characterize Quinn Emanuel's enforcement of its established rights as illegal retaliation. Nor can she r to relitigate the same issues Dr. Nwaneri has already litigated (extensively) and lost (resoundingly)."). Aside from echoing their own conclusory assertion, Defendants fail to provide a single example of a legal or factual claim in the Amended Complaint that was "litigated,"

---

[24] *See, e.g.,* Defs.' Mem. at 20 ("Lest there be any doubt, Nwaneri's father-in-law has litigated the very same issues and allegations—and lost on them—in four different fora, including an arbitration tribunal, two lower courts (state and federal), and one appellate court (federal)."); *id.* at 22 ("Dr. Nwaneri has litigated and lost on the very same factual issues and legal theories that his daughter-in-law is now attempting to rehash under the auspices of her employment suit.").

[25] And Defendants' claims that multiple courts have "adjudged" these issues are blatant misrepresentations as well. As mentioned, the 2016 Maryland state court proceeding concerned Defendants' withdrawal based on falsely inflated bills. The 2017 arbitration Defendants initiated days after Plaintiff filed her EEOC charge concerned Defendants' sudden attempt to collect the fees they refused to correct or accept the year before. The federal court proceeding involved removal of the arbitration confirmation proceeding from D.C. Superior Court to federal court. And the D.C. Superior Court proceeding was merely a "summary" hearing to confirm the arbitration award, as Defendants argued extensively, and did not consider or rule on the underlying fee dispute or the issues raised in the Sur-reply. Defendants' weak argument that "multiple" courts have "adjudged" the "very same" issues relevant to Plaintiff's retaliation claim, and any suggestion that Plaintiff raised these issues in any proceedings, are baseless.

"determined," or "essential" to any judgment in the earlier proceedings.[26] *See Davis*, 663 A.2d at 504.

Defendants' failure to provide any factual or legal support for their claim that any of the issues raised by Plaintiff's claims meet any of the criteria for issues preclusion requires denial of their motion on this basis. *See Davis*, 663 A.2d at 504. It goes without saying that Defendants cannot meet the 3rd criteria because Plaintiff did not have an opportunity to litigate any of her claims in the prior proceedings (much less a "full and fair" one), which presents the fundamental constitutional problem with Defendants' argument. Beyond that, Defendants cannot (and did not) establish that any of the claims Plaintiff raised were "actually litigated", "determined… on the merits", or "essential to" any judgment. Despite attaching more than 40 pages of extrinsic exhibits and making innumerable allegations outside the pleadings, Defendants' silence about the actual elements required for issue preclusion (and how they purportedly apply to Plaintiff's claims) is most telling.

But **repeating an allegation does not make it true, especially when it comes to Defendants' representations to the Court. Defendants' motion to dismiss claimed Quinn Emanuel** never refused payment from Mr. Nwaneri and that Plaintiff's allegations on this issue were "incorrect," *see* Defs.' Mem. at 21, but the transcript of the hearing shows otherwise, see MTW

---

[26] The only citation Defendants offer is a "compare" signal referencing the Amended Complaint and a Sur-Reply opposing Defendants' motion to confirm the arbitration award in D.C. state court, *id.* at 22). But similarity between issues is not sufficient for collateral estoppel to apply. *See Hutchinson v. D.C. Office of Empl. App.,* 710 A.2d 227, 236 (D.C.1998) ("Issue preclusion does not apply when the issues in the prior and current litigation are not identical, even though [they are] similar."). And Defendants' feeble "compare" signal does not come close to satisfying any of the elements required for issue preclusion. *See Davis,* 663 A.2d at 504.

Hearing Trans. at 23:11-20 (showing Defendants refusing payment from Mr. Nwaneri or to continue representing Mr. Nwaneri under any circumstances on the record in open court). At the September 2016 hearing, Defendants told the Court that "after we filed the motion to withdraw [Plaintiff] threatened to sue Quinn Emanuel," but this is directly contradicted by the dates of the June 30, 2016 letter from Plaintiff's counsel and Defendants' July 12, 2016 Notice from Corey (to Mr. Nwaneri informing him of the purported payment issue and Defendants' plan to withdraw on that basis). *See* Ex. 2, July 12, 2016 Letter Notice from Corey. Defendants repeatedly told the court that Plaintiff was employed through "July 2016," see Ex. 3, MTW Hearing Trans. at 26:7-12, but never paid Plaintiff any wages for any day in July 2016, *see* Am. Compl. at ¶ 74. And Defendants now claim Plaintiff's date of termination was May 4, 2016, so that they can seek dismissal of some of Plaintiff's claims based on a two-minute filing delay. *See* Defs.' Mem. at 13-14.

### III.   The Claims in the Amended Complaint are Timely and Sufficiently Stated.

Defendants concede that Plaintiff's claims under Section 1981, Section 1985(3), and certain claims under the Equal Pay Act are timely. Defendants argue the remaining claims should be dismissed as untimely, but do not apply the high standard required at the pleading stage for dismissal based on timeliness. This Circuit cautions against such dismissals "because statute of limitations issues often depend on contested questions of fact." *Momenian v. Davidson,* 878 F.3d 381, 387 (D.C. Cir. 2017) (cleaned up). A "complaint cannot be dismissed as conclusively time barred unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief," *id.*

### a.   Section 1981 Claims, 42 U.S.C. § 1981

Defendants concede that Plaintiff's Section 1981 claims are timely for the period after May 7, 2015. Defs.' Mem. at 19. Plaintiff's claims for the period before that are also valid based on the continuing violation doctrine.

### i. Allegations State a Claim for Retaliation Under Section § 1981 Against All Defendants.

The allegations of the Amended Complaint exceed the pleading standards required for a retaliation claim under Section 1981. To prove retaliation, a plaintiff must show: (1) "that he opposed a practice made unlawful by Title VII"; (2) that "the employer took a materially adverse action against him"; and (3) that "the employer took the action 'because' the employee opposed the practice." *Harris v. D.C. Water & Sewr*, 791 F.3d 65, 68 (2015) (cleaned up). As alleged in the Amended Complaint, Plaintiff engaged in several protected activities. And Defendants' repeated pattern of retaliation and harassment following Plaintiff's complaints of discriminatory and abusive conduct.

Defendants argue that Plaintiff does not state a claim for retaliation because the Amended Complaint does not adequately allege: (1) that Plaintiff "opposed any practice that has been outlawed", (2) that "Defendants took any adverse action against her because" of her protected activity, (3) a prima facie case for discrimination in the denial of a promotion or termination, (4) temporal proximity between Defendant's decision to terminate her employment and the end date, and (5) "a third party retaliation claim on behalf of Dr. Nwaneri" because (a) "the alleged retaliation was not against an 'employee or former employee' of Defendants" and (b) "Nwaneri's allegations related to the arbitration are demonstrably false and independently foreclosed as a matter of law". Defs.' Mem. at 32- 34. Each of these arguments fail for two primary reasons. First, Defendants insist on subjecting Plaintiff's allegations to heightened pleading requirements that are inappropriate at the motion to dismiss stage. Second, the substantive arguments Defendants advance are entirely

FIRST FORTY-FIVE PAGES ONLY

inconsistent with the law of retaliation, rely on outdated or nonexistent legal standards, and ignore or distort the allegations of the Amended Complaint.

### 1. Defendants Improperly Invoke a Heightened Standard of Review that is Only Appropriate for Post-Discovery Motions.

First, Defendants rely on a heightened standard of review that is not appropriate at the pleading stage. Second, they misconstrue the nature of a retaliation claim and misstate the applicable standards of proof and harm. Third, they ignore the allegations of the Amended Complaint in favor of their own, often contrary — and demonstrably false — assertions of fact.

In asserting that Plaintiff fails to adequately allege a retaliation claim because the Amended Complaint does not set forth a prima facie case, Defendants fail to recognize the very limited standard of review applicable at the pleading stage. In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), the Supreme Court rejected the proposition that any such heightened pleading requirement applies to retaliation of discrimination claims. In particular, the Court held that a discrimination complaint does not need to set forth "specific facts establishing a prima facie case of discrimination," but instead need only provide "fair notice of the basis for [the plaintiff's] claims" consistent with Fed. R. Civ. P. 8(a)(2). *Id.* at 508, 514. Discovery and summary judgment define the law and narrow the issues, not a heightened pleading standard. *See id.* at 512.

Defendants would nonetheless have this Court hold Plaintiff's complaint to a standard of review that is appropriate only for post-discovery motions. Defendants' motion reads more like a post-trial attack than a motion to dismiss. This attack is undermined not only by *Swierkiewicz* and *Twombly*, but even the authorities on which Defendants rely. Tellingly, of the seven retaliation cases Defendants cite in this portion of their motion, only two address Rule 12(b)(6) motions, *Arafi v. Mandarin Oriental Hotel*, 867 F.Supp.2d 66 (D.D.C. 2012) (denying motion to dismiss §1981

retaliation claim and deeming sufficient plaintiff's allegations that his work hours were reduced in response to 2 verbal complaints about the negative "treatment" he received), and *Murphy v. D.C.,* 390 F. Supp. 3d 59, 71 (D.D.C. 2019) (denying motion to dismiss Title VII retaliation claim based on allegations that, in retaliation for plaintiff's wife's participation in a Title VII lawsuit, he was terminated two days later). Notably, Defendants used these cases to set out the elements, but applied the summary judgment cases to support Defendants' claims that Plaintiff's allegations were insufficient. In both of these cases, the court denied the motion to dismiss, finding that the minimal allegations made by those plaintiffs were sufficient to state retaliation claims on a Rule 12(b)(6) motion. *See* Defs.' Mem. at 32.

Through discovery, Plaintiff may obtain additional proof of Defendants' discrimination, retaliation, and harassment (and may present such proof at trial); however, at the pleading stage, Plaintiff is not required to allege the existence of every fact supporting that might be presented to a jury. *See Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir.2000) ("It is not necessary for the plaintiff to "plead law or match facts to every element of a legal theory.").

### ii. Defendants' Arguments Against Plaintiffs' Retaliation Claims are Based Entirely on the Wrong Legal Standards, Inapplicable Law, and Standards Long Since Superseded by Supreme Court and D.C. Circuit Precedent.

Second, Defendants repeatedly insist that Plaintiff cross additional hurdles for the retaliation claims to survive a motion to dismiss, relying on inapplicable law and the incorrect legal standards. First, Defendants contend that retaliation claims require proof that the conduct being complained of was actually unlawful — a standard that is not required for any retaliation claim (and certainly not one on a motion to dismiss). *See* Defs.' Mem. at 33 (claiming Plaintiff must "allege that she opposed any practice that has been outlawed" and "demonstrate that Shaffer's conduct constitutes 'an employment practice made unlawful.'"). As the court in *Arafi* explained, "[w]hether [] a Plaintiff's

FIRST FORTY-FIVE PAGES ONLY

complaints are actionable under Title VII does not determine the viability of his retaliation claims. Instead, Plaintiff's retaliation claim survives so long as he alleges facts that support he made complaints to the [defendant's] management about what he perceived to be his supervisor's discriminatory behavior." 867 F.Supp.2d at 76; *see also McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir.2012) (holding that employee may not be punished for opposing a practice that he or she "reasonably and in good faith believed was unlawful under [Title VII]").

Defendants also appear to assert that, for her retaliation claim to proceed, Plaintiff must (a) show that the alleged retaliation resulted in "adverse [employment] action" such as the denial of a promotion, and (b) must establish a prima facie case for denial of promotion.   For example, Defendants contend, that to establish a retaliation claim Plaintiff must meet the elements of a denial of promotion claim (the purported "adverse action," according to Defendant's flawed reasoning). *See* Defs.' Mem. at 33 (claiming that Plaintiff's allegations relating to Defendants' retaliation lacked proof that Plaintiff was entitled to a promotion and listing the elements for a claim for denial of promotion claim).  This argument misses the mark in all respects.

First, Defendants continue to apply the wrong standard of harm in retaliation cases by relying on the "adverse employment action" requirement, which no longer applies to retaliation claims.  As discussed, the current standard of harm for retaliation cases is a "materially adverse action," one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 68 (2006) (holding that retaliation claims are subject to a different, broader standard of harm than discrimination claims and only require plaintiffs to allege that the retaliatory conduct was "materially adverse" such that it would dissuade a reasonable worker from making a charge of discrimination); *see Mogehan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010).

**FIRST FORTY-FIVE PAGES ONLY**

Defendants also attack the adequacy of the Amended Complaint's retaliation allegations on the ground that the complaint the Amended Complaint "fails to allege that Defendants took an adverse action against her because she opposed an unlawful practice." Defs.' Mem. at 33. This argument fails for two reasons.

Second, contrary to Defendants' argument that proof of any prima facie case is required at the pleading stage, the caselaw of the Supreme Court and this Circuit have made it abundantly clear that no such requirement exists at the pleading stage. "At the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case." *Brady v. Office of Sergeant at Arms*, 520 F. 3d 490, 494 (D.C. Cir. 2008). And Defendants' argument was the position rejected by the Court in *Swierkiewicz v. Sorema N.A.*, where the Court explained that a "prima facie case [] is an evidentiary standard, not a pleading requirement." 534 U.S. 506, 510 (2002) (reversing circuit court's dismissal of employment discrimination case for failure to establish prima facie elements").

Moreover, as discussed above, Plaintiff did allege facts consistent with the prima facie elements of retaliation. The Amended Complaint more than adequately alleges facts to support a retaliation claim. The elements of a retaliation claim under Section 1981 are that the plaintiff (1) engaged in statutorily protected activity; (2) suffered "a materially adverse action"; and (3) that a causal link connects the two. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Although plaintiffs are not required to satisfy the prima facie elements, the Amended Complaint does.

At this juncture, the proper inquiry is whether the Amended Complaint gives Defendants fair notice of the nature of a plausible retaliation claim. *See, e.g., Swierkiewicz*, 534 U.S. at 514. The Amended Complaint does so by enumerating: (1) several reports of discriminatory and harassing treatment, which Plaintiff made to the firm management (Burck and Corey, who co-

managed the office at the time) and to Quinn Emanuel's designated contact person for EEO and harassment issues in the D.C. office (Corey), *see, e.g.,* Am. Compl. at ¶¶ 13-14, and (2) Defendants took "materially adverse actions" against her (i.e., actions likely to "dissuade a reasonable worker from making a charge of discrimination"; (3) shortly after Plaintiff's discrimination complaints, *see, e.g.,* Am. Compl. at ¶¶ 68-69.   The Amended Complaint details several retaliatory acts by Defendants in response to Plaintiff's protected complaints of discrimination, that such acts are: likely to dissuade a reasonable employee from engaging in protected activity.  *See* Am. Compl. at ¶¶ 108, 109, 132, and 133 (providing examples of Defendants' retaliatory conduct); *see* Am. Compl. at ¶¶ 110, 134 (alleging "Defendants' retaliatory acts are likely to dissuade an employee from engaging in protected activity").  Finally

Regarding the first element, the allegation reflect that Plaintiff made multiple reports of discriminatory conduct and that these reports were met with indifference, lip service, or ignored.  Meanwhile, the discriminatory and harassing conduct continued and intensified.  See, e.g., Am. Comp. at ¶ 42 (noting Plaintiff's July 2015 written complaint to Burck and Shaffer about "Shaffer's disparate and abusive treatment towards her" in which she "identified her race (as the only African-American on the case team) as the apparent reason for Shaffer's discriminatory conduct" and "asked Shaffer to treat her with the same respect as he afforded her white and male colleagues"); Am. Comp. at ¶ 42 ("Plaintiff complained about Shaffer's disparate treatment and harassment to firm management again, this time contacting Corey, who was the firm's designated EEO and harassment contact person and co-managing partner of the D.C. office at the time.  Plaintiff met with Corey in mid-July to discuss Shaffer's discriminatory and harassing conduct").

As to the second and third elements, that Defendants took a "materially adverse actions" shortly after Plaintiff's protected activity, Plaintiff alleges several examples:  including that

Defendants took active steps to reduce her workload, remove her from cases days after her July 2015 complaints of discrimination, and replace her with white male associates, *e.g.,* Am. Compl. at ¶ 45 ("After the [July 2015] meeting, Shaffer and Burck retaliated against Plaintiff again by drastically reducing her role on the case, marginalizing her, and transferring her case assignments and supervisory responsibilities to a white male associate"); Am. Compl. at ¶ 46 ("Less than a week after Plaintiff's meeting with Corey [regarding Shaffer's discriminatory and harassing conduct], however, Burck and Shaffer removed Plaintiff her from the matter entirely without notice and replaced her with another white male associate."). Being replaced by a person from a different protected class raises an inference of discrimination. *See de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 20 (2d Cir.1996) ("As a Puerto Rican, de la Cruz is a member of a protected class. Because de la Cruz was replaced by a black female, he also satisfies the fourth prong of the prima facie case.").

Likewise, Plaintiff alleges that immediately after her email complaints to Corey about Burck's harassment and disparate treatment, including her emails in late April 2016 and late May 2016, Defendants immediately took materially adverse actions against her: (a) denying her any partnership consideration in May 2016, and (b) terminating her employment in June 2016. Am. Compl. at ¶¶ 68-69. Specifically, four days after emailing Corey her first written complaint about Burck in late April 2016, Defendants ambushed Plaintiff in a May 4 meeting and abruptly informed Plaintiff she would not make partner, thus depriving Plaintiff of any partner consideration at all despite her partnership deferral agreement with Quinn Emanuel (through November 2016). *Id.* Approximately a week after Plaintiff sent another email to Corey in late May 2016 (describing additional harassment and increased scrutiny from Burck and others), Corey met with Plaintiff on

FIRST FORTY-FIVE PAGES ONLY

or about June 7, 2016, and abruptly informed her the Defendants' decision was final and her end date would be July 2, 2016. Am. Compl. at ¶¶ 71-73.

Third, Defendants' contention that Plaintiff fails to allege temporal proximity between her protected activities and Defendants' retaliatory actions fails as a matter of fact and law. *See* Defs.' Mem. at 34. But the causation element does not impose a high burden. "The plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive," which "may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Robinson v. Ergo Solutions, LLC*, 85 F. Supp. 3d 275, 282 (D.D.C. 2015) marks omitted).

Plaintiff has alleged that her complaints of discriminatory treatment were closely followed by Defendants' retaliatory actions, ranging from a few days (such as the 3-day period between Plaintiff's filing an EEOC charge in February 2017 and Defendants' initiation of an arbitration lawsuit against her close family member, *see* Am. Compl. at ¶¶ 76-78, to one week (such as Plaintiff's July 2015 complaints about Shaffer and Defendants' removal of her from the case team and reassignment of her responsibilities to white males within "less than a week", *see* Am. Compl. at ¶¶ 45-46). These timeframes satisfy the standard of temporal proximity under any of the case law in this Circuit.

Defendants suggest that there is a maximum period of 3 months between an employee's protected complaint and an employer's challenged action to establish causation, *see* Defs.' Mem. at 34. This is not consistent with applicable caselaw or the policies considerations underlying Section 1981 and Title VII. As one court in this District explained, applying a rigid standard would simply "encourage malfeasant employers to wait until the time limit has just passed before taking retaliatory action." *Robinson v. Ergo Solutions, LLC*, 85 F. Supp. 3d 275, 282 (D.D.C. 2015). There are no

bright line rules about the amount of time between a protected activity and an employer's retaliation necessary to establish causation. *See, e.g., id.* (denying motion to dismiss retaliation claim based on five-month period between protected activity and retaliatory action and declining "to conclude categorically at this stage that causation cannot be established"); *Brodetski v. Duffey*, 141 F.Supp.2d 35, (D.D.C.2001) ("Although courts have not established the maximum time lapse between protected Title VII activity and alleged retaliatory actions for establishing a causal connection, courts generally have accepted time periods of a few days up to a few months and seldom have accepted time lapses outside of a year in length.").

Fourth, Defendants contend that a third-party retaliation claim "on behalf of Mr. Nwaneri" is not possible because the alleged retaliation is not an employee. This argument fails because Plaintiff's claims are not "on behalf of Mr. Nwaneri," as is evident from the Amended Complaint and as explained earlier. Defendants are being disingenuous, as usual, so as to insinuate Plaintiff has alleged viable claims for retaliation against Defendants based on their direct and indirect retaliation against her in the arbitration. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (finding third parties and former employees are within meaning of "employees" for purposes of Title VII).

Defendants' claim that Plaintiff's allegations "related to the arbitration are demonstrably false and independently foreclosed as a matter of law" are meritless. Defs.' Mem. at 34. As discussed at length, Defendants' allegations about the underlying facts are false—not Plaintiffs'— and again, this is a Rule 12(b)(6) motion to dismiss, which assumes the truth of Plaintiff's allegation. Likewise, Defendants' conclusory statement that any third-party claims are "independently foreclosed as a matter of law" (an apparent reference to Defendants' woeful attempt to invoke collateral estoppel and to ignore binding authority confirming third-party retaliation claims) must